IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITY HEALTH PLANS INSURANCE
CORPORATION,

        Plaintiff,

v.

                                        Case No. 13-CV-845

IOWA HEALTH SYSTEM d/b/a
UNITYPOINT HEALTH,

        Defendant.

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    FACTUAL BACKGROUND.........................................................................................2

    A.   UnityPoint Health's Adoption of the UnityPoint Health Mark...............................2

    B.   UnityPoint Health's Intended Use of the UnityPoint Health Mark in Wisconsin .............4

    C.   Harm to UnityPoint Health if an Injunction is Issued ...........................................6

    D.   Unity Health Insurance's Claim of Trademark Infringement .................................9

       1.   Unity Health Insurance's Use of the Alleged Trademark ............................9

       2.   Alleged "Confusion" Incidents .................................................................10

III.   ARGUMENT...............................................................................................................12

    A.   The Legal Standard for Preliminary Injunctions .................................................12

    B.   Unity Health Insurance has not Established that It has a Reasonable Likelihood of
Success on the Merits ..........................................................................................14

       1.   Unity Health Insurance has not Established that It has a Valid Protectable
Mark in the Term "Unity"........................................................................14

          a.   Unity Health Insurance's marketing and business materials demonstrate
Unity Health Insurance does not have rights in "Unity" alone.................16

          b.   Unity Health Insurance never provided any public notice that it intended
to have trademark rights in "Unity" alone .............................................18

       2.   Unity Health Insurance has not Established a Likelihood of Confusion Exists ...........19

          a.   The Marks are not similar in sight, sound or meaning ...........................21

          b.   Unity Health Insurance has Proffered No Probative Evidence of Actual
Confusion..............................................................................................25

             i.   The accounts of alleged confusion by any unknown customers are vague,
ambiguous and nothing more than hearsay.........................................26

             ii.   A review of the audio clips for three individuals demonstrates there was no
confusion as to source or affiliation ...................................................27

             iii.   The remaining evidence of alleged confusion is *de minimis* ...............30

          c.   Unity Health Insurance concedes there was no intent to "palm off" .....................33

          d.   The term "Unity" is a weak mark because it has not acquired secondary
meaning and is used extensively by third-parties .................................33

             i.   Unity Health Insurance has not acquired secondary meaning in "Unity"............34

             ii.   The term "Unity" is used extensively by third parties .........................35

          e.   Consumers and potential consumers exercise a reasonable degree of care............38

          f.   Under the circumstances of this case, the services offered by the parties,
and the area and manner of concurrent use are sufficiently distinct .....................40

    E.   Unity Insurance Has Failed to Show It Will Suffer Irreparable Harm .............................41

i

F.   The Balance of Hardships and the Public Interest do not Favor Granting a Preliminary Injunction .......................................................................................................42

IV.   CONCLUSION..........................................................................................................43

## TABLE OF AUTHORITIES

*Cases*

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) .......................................31

*Abbot Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992)............................................13, 14

*Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979)..................................36

*August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616 (7th Cir. 1995) ...................................................25

*Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041
    (7th Cir. 2000) .................................................................................13, 20, 21, 25, 32, 33, 38, 39

*CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660 (7th Cir. 2001) ..............25, 26, 33, 35, 38

*Carter v. Radtke*, Case No. 09-cv-437-wmc, 2011 U.S. Dist. LEXIS 70439
    (W.D. Wis. 2011)................................................................................................................12

*Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970).......................35, 36

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217
    (2d Cir. 1987)...............................................................................................................................35

*Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).......................................................27

*Colgate-Palmolive Co. v. Carter-Wallace, Inc.*, 432 F.2d 1400 (C.C.P.A. 1970) .......................24

*DSMR, LLC v. Goldberg*, 2004 U.S. Dist. LEXIS 4879 (N.D. Ill. Mar. 24, 2004).......................15

*Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093 (8th Cir. 1996)....................39, 40

*Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264 (7th Cir. 1989) ................................13

*Edsal Mfg. Co. v. Vault Brands, Inc.*, Case No. 11-C-9287,
    2012 U.S. Dist. LEXIS 163479 (N.D. Ill. Nov. 15, 2010) .........................................................15

*El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721 (5th Cir. 1954)........................................................36

*Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F. Supp. 786 (N.D. Ill. 1990)..................................20

*Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713
    (Fed. Cir. 1992)...........................................................................................................................27

*Estate of Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538 (1920)............................................21

*First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040 (8th Cir. 1996).................................................15

*First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987).......................................35

*First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645 (10th Cir. 1996) .....................................35

*Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001 (8th Cir. 2005) .................14

*G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436 (E.D. Wis. 1987)............20

*Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646 (D. Md. 2002)...............................32

*HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154
    (D. Colo. 2012) .........................................................................................................39, 40

*Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (10th Cir. 1998).......................................23

*Henri's Food Products*, 717 F.2d 352 (7th Cir.1983).......................................................21, 31, 35

*Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445 (5th Cir. 1973) ...............................36

*Humana, Inc. v. Humanomics, Inc.*, TTAB Opp. No. 71,097,
    1987 TTAB LEXIS 59, 1987 WL 124301 (T.T.A.B. 1987) ......................................................40

*In re Int'l Nickel Co.*, 48 C.C.P.A. 701, 127 U.S.P.Q. 331 (1960) ................................................17

*In re Vicki Roberts*, 87 U.S.P.Q.2d 1474, 2008 WL 1944634 (T.T.A.B. 2008) ...........................17

*In re Yale Sportsware Corp.*, 88 U.S.P.Q.2d 1121, 2008 WL 2675684 (T.T.A.B. 2008).............17

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079 (7th Cir. 1988)..............40

*Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844 (1982)..................................................34

Johnny Blastoff Inc. v. Los Angeles Rams Football Co.,
    Case No. 97-C-155-C, 1998 U.S. Dist. LEXIS 11919 (W.D. Wis. June 24, 1998) .................16

*King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400 (C.C.P.A. 1974) ........................41

*Knaack Manufacturing Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991 (N.D. Ill. 1997)...........38

*Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360 (7th Cir. 1995)............................................32

*Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827 (8th Cir. 1999)...............................................23, 38

*Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399
    (C.C.P.A. 1994) .........................................................................................................................24

*Master Clean, Inc. v. ServiceMaster Co.*, 181 F. Supp. 2d 821 (S.D. Ohio 2002).......................31

*Maxim's Limited v. Badonsky*, 772 F.2d 388 (7th Cir. 1985) .......................................................38

iv

*McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163 (7th Cir. 1986)....................31, 32, 35

*McGraw-Hill Pub. Co. v. American Aviation Associates, Inc.*, 117 F.2d 293
   (D.C. Cir. 1940) ........................................................................................................31, 32

*McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir. 1979) ......................................33

*Michael Caruso & Co. v. Estefan Enter., Inc.*, 994 F. Supp. 1454 (S.D. Fla. 1998)....................36

*Microwave Systems Corp. v. Apple Computer, Inc.*, 126 F.Supp. 2d 1207 (S.D. Iowa 2000)......41

*Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000)................................................23

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474
   (S.D.N.Y. 2002) ........................................................................................................17

*Nike Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225 (7th Cir. 1993) ..........................21, 32, 38, 40

*Ortho Pharm. Corp. v. Am. Cyanamid Co.*, 361 F. Supp. 1032 (D.N.J. 1973) ............................27

*Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001)................................23, 25, 31, 33

*PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558 (2d Cir. 1990)...............................................34

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F.Supp. 2d 815
   (N.D. Ill. 1999) ........................................................................................................24

*Platinum Home Mortgage Corp. v. Platinum Fin. Grp. Inc.*, 149 F.3d 722 (7th Cir. 1998) .13, 14,
   30, 31, 34

*Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909 (7th Cir. 1996)...........:.................................32

*Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749
   (6th Cir. 1998) ........................................................................................................17

*Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir. 1984) ...............................12

*Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210 (7th Cir. 1997).....2, 13, 14,
   20, 38

*S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d at 878 (N.D. Ill. 1998)...................................26, 36

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, Case No. 11-C-861,
   2014 U.S. Dist. LEXIS 4549 (W.D. Wis. Jan 14, 2014) .........................................................15

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992).....................20, 40

*Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423 (7th Cir.1985) ........................................20

*Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176 (7th Cir. 1989) .............................13, 20

*Self-Realization Fellowship Church v. Ananda Church of Self- Realization,*
59 F.3d 902 (9th Cir. 1995) .................................................................................................17

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754 (8th Cir. 2010) ....................25

*Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327 (7th Cir. 1993)..........................26, 27

*Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004) .............................................................21, 23

*Telemed Corp.* v. Tel-Med, Inc., 588 F.2d 213 (7th Cir. 1978) .......................................................41

*Thompson Medical v. Pfizer Inc.*, 753 F.2d 208 (2nd Cir. 1985) ...................................................34

*Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344 (N.D. Ill. 1996) ........................................39

*TV Land, L.P. v. Viacom International, Inc.*, 908 F. Supp. 543 (N.D. Ill. 1995) ..........................38

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)..........................................................16

*Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001)....................................................21

*Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976) ......................................31

*United Indus. Corp. v. Clorox*, 140 F.3d 1175 (8th Cir. 1998) ......................................................42

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112 (2d Cir. 1984).........................21

*Universal Money Ctrs. Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527 (10th Cir. 1994) ....................36

*Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968)..............35

*Zeibert Int'l Corp. v. After Market Assocs., Inc.*, 802 F.2d 220 (7th Cir. 1986).....................20, 23

**Statutes**

15 U.S.C. § 1115....................................................................................................................14

**Other Authorities**

1 McCarthy on Trademarks § 3:3 .........................................................................................15

2 McCarthy on Trademarks § 11:73 .....................................................................................33

2 McCarthy on Trademarks § 11:75 .....................................................................................33

2 McCarthy on Trademarks § 15:32 .....................................................................................14

3 Callman, Law of Trademarks § 82.1 .................................................................................24

3 McCarthy on Trademarks § 23.41 ..................................................................................21

4 McCarthy on Trademarks § 23:3 ..................................................................................31

5 McCarthy on Trademarks § 30:30 ................................................................................13

Restatement (Third) of Unfair Competition § 20 (1995).............................................27

Robert Lind *et al.*, 3 Entertainment Law 3D: Legal Concepts and Business
    Practices § 17:4..........................................................................................................17

## I.   INTRODUCTION

Defendant Iowa Health System d/b/a UnityPoint Health ("UnityPoint Health") submits this memorandum in opposition to the motion of Plaintiff Unity Health Insurance Plans ("Unity Health Insurance") for a preliminary injunction. (Dkt. No. 5.) In claiming rights to the unregistered mark "UNITY," and in seeking its injunction, Unity Health Insurance ignores crucial facts demonstrating that there is no likelihood of confusion between the parties' respective services and certainly no likelihood of success on the merits of the case at this early stage of the proceedings.  Unity Health Insurance's motion fails for numerous reasons:

- Unity Health Insurance fails to establish that it is even entitled to trademark rights in and to its purported mark "Unity";

- UnityPoint Health's proposed branding of:





is dramatically distinct in sight, sound and



connotation from Unity Health Insurance's usage of:

- Unity Health Insurance's purported evidence of alleged confusion wholly fails to demonstrate that an appreciable number of consumers will be confused by the co-existence of these two marks in Wisconsin; and

- Unity Health Insurance's purported "Unity" trademark is at best a commercially weak mark used by many businesses in the health care field—even within the state of Wisconsin.

Even at this early stage of the litigation, the facts make it clear that there is very little, if any, possibility of confusion among the parties' customers or potential customers, let alone confusion of an "appreciable number" of consumers, which Unity Health Insurance has the

1

burden to establish. *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1219

(7th Cir. 1997). Unity Health Insurance's motion for a preliminary injunction should therefore

be denied.

## II.    FACTUAL BACKGROUND

### A.    UnityPoint Health's Adoption of the UnityPoint Health Mark

UnityPoint Health is an Iowa nonprofit corporation, which operates a regional healthcare

delivery system and includes twelve hospitals in Iowa, four hospitals in Illinois and one hospital

in Wisconsin. (Defendant's Proposed Supplemental Findings of Fact ("DSFOF"), ¶ 1.)

Collectively, these organizations employ more than 900 physicians who practice in

approximately 94 communities. (DSFOF, ¶ 2.) From the time of its formation in 1994 until

April 2013, UnityPoint Health was known by its legal name, Iowa Health System ("IHS").

(DSFOF, ¶ 3.) At all times, UnityPoint Health's branding included its distinctive Greek blue

cross. (DSFOF, ¶ 4.)

Changing the name of the organization from Iowa Health System to UnityPoint Health

was part of a transformation process that began several years earlier when management and the

Board of Directors approved a vision statement of "best outcome every patient every time."

(DSFOF, ¶ 5.) This vision re-focused the organization toward the goal of providing higher value

and lower cost services to its constituents. (DSFOF, ¶ 6.) The organization also committed to a

patient-centered and physician-driven culture statement, which reflected the organization's

continued focus on patient-centered care and recognized a greater level of physician involvement

and leadership. (DSFOF, ¶ 6.) Patient care coordination, as described in federal healthcare

reform, and growth objectives were identified as part of the transformation process to help

reduce cost, provide high value services to Midwestern communities and allow UnityPoint

2

Health providers to receive reimbursement in payment methods based on patient outcomes. (DSFOF, ¶ 7.)

The new name, UnityPoint Health, provided a single brand name for use across the healthcare system and signaled an important consolidation of services, as well as a brand identity, that had not previously existed. (DSFOF, ¶ 8.) For decades prior to their affiliation with IHS, the providers were primarily known by their individual, differing identities that they had for decades prior to their affiliation with IHS. (DSFOF, ¶ 9.) This name change and refashioned branding of IHS reflected the commitment by UnityPoint Health providers to provide the same level, quality and type of care across the system. (DSFOF, ¶ 10.) Importantly, although the name was changed from Iowa Health System to UnityPoint Health, the overarching brand—the Greek blue cross was maintained. (DSFOF, ¶ 11.) As a result, UnityPoint Health now had one brand or image across the system—a brand that emphasizes the organization's commitment to have one system with the same standard of care providing services in different regions as opposed to various systems providing services to different regions. (DSFOF, ¶ 12.)

Substantial time, money and effort were expended in this rebranding effort. (DSFOF, ¶ 13.) By way of example, the initial stage of this rebranding effort included interviews with administrators across the system and twelve (12) qualitative focus groups with staff members and the public in in each affiliate market. (DSFOF, ¶ 14.) After this initial stage, a variety of names were considered and ultimately eight (8) were chosen for further brand testing. (DSFOF, ¶ 15.) The CEOs of each affiliate hospital organization within IHS was given input and four (4) focus groups were conducted in three (3) IHS affiliate markets: Des Moines, Cedar Rapids, and Quad Cities. (DSFOF, ¶ 16.) Ultimately the new branding of the Greek cross and UNITYPOINT HEALTH was recommended because it matched the strategic model of health

care delivery and the positioning statements that resonated with the organizations' audience, and because in 2011 IHS entered into an affiliation agreement with an Illinois corporation and the prior branding of "Iowa Health" had an obvious geographic connotation. (DSFOF, ¶ 17.) There was widespread communication of this refashioned brand identity in April 2013. (DSFOF, ¶ 18.)

On May 2, 2013, UnityPoint Health applied for three federal trademark applications with the United States Patent and Trademark Office ("USPTO") for trademarks including the term "UNITYPOINT" for use in connection with managed healthcare services: UNITYPOINT (Serial No. 85614800), UNITYPOINT CLINIC (Serial No. 85614825) and UNITYPOINT HEALTH (Serial No. 85614842). (DSFOF, ¶ 19.) These marks were approved for registration in December 2013 when the USPTO issued a Notice of Allowance for each of the applications. (DSFOF, ¶ 20.) No one filed any opposition with the USPTO relating to these marks, and the marks were all finally approved for registration in December 2013. (DSFOF, ¶ 21.) After expending substantial time and money developing a name-change marketing campaign, UnityPoint Health first used the UnityPoint Health Trademarks in commerce in April 2013. (DSFOF, ¶ 21.)

**B.    UnityPoint Health's Intended Use of the UnityPoint Health Mark in Wisconsin**

On October 10, 2013—well over a year after UnityPoint Health filed its intent-to-use trademark applications for its UNITYPOINT-formative marks—UnityPoint Health entered into an Affiliation Agreement with Meriter Health Services, Inc. ("MHS") pursuant to which UnityPoint Health would become the sole corporate member of MHS, and acquire control over Physicians Plus Insurance Corporation ("PPIC"). (DSFOF, ¶ 23.) The transaction closed January 1, 2014. (DSFOF, ¶ 24.)

This affiliation has been widely publicized throughout Southern Wisconsin, including through television spots on ABC 9/WAOW, NBC/WGEM, NBC15/WMTV and newspaper articles and other publications, including the Wisconsin State Journal, The Business Journal, Milwaukee Sun, The Milwaukee Wisconsin Journal Sentinel, and Modern Healthcare.  (DSFOF, ¶ 25.)  Letters announcing the affiliation were also sent to all Meriter patients in October 2013. (DSFOF, ¶ 26.)  The choice of the UnityPoint Health name had nothing to do with Unity Health Insurance, and the name of Unity Health Insurance had no connection to the eventual affiliation between UnityPoint Health and Meriter.  (DSFOF, ¶ 27.)

UnityPoint Health has not yet made any name change to the Meriter-branded hospital or any of the clinics, all controlled by MHS, in and around the immediate area of Madison, Wisconsin. (DSFOF, ¶ 28.)  However, UnityPoint Health intends to keep the well-known Meriter name as the dominant and prominent portion of its brand in a concerted effort to ensure there will be no confusion,[1] and intends to use the following logos in connection with branding the Meriter affiliated hospital, clinic and home healthcare:



(DSFOF, ¶¶ 28, 29.)  Moreover, importantly, the affiliated insurance entity, PPIC, will retain its name and continue to use the following logo:

---

[1] Unity Health Insurance makes much of a statement attributed to UnityPoint Health's CEO Bill Leaver.  (Dkt. 11 at 24).  As an initial matter, Unity Health Insurance distorts the statement altogether by stating that UnityPoint Health acknowledged confusion exists.  Indeed on its face, this document shows that Mr. Leaver was simply responding to a question by the reporter as to potential confusion and he indicated that UnityPoint Health would mitigate "that" confusion— e.g., the potential confusion raised by the reporter.  As demonstrated herein, UnityPoint Health has taken steps to avoid even the slimmest possibility of confusion by maintaining the distinctive and well-known Meriter name and logo as the dominant commercial impression of its mark in Wisconsin.



(DSFOF, ¶ 30.)

The Meriter name and logo has consistently and exclusively been used in connection with health care services in Madison and Central and Southern Wisconsin dating back to 1987, and Meriter has federally registered both its "Meriter" name and the **MERITER** logo. (DSFOF, ¶ 31.) Through its commitment to great service, Meriter Health Services and its hospital, clinics and physicians have earned a reputation for delivering high quality healthcare. By way of example only, Meriter Hospital received the "Top 100 Hospital, National Benchmark Award" in 2009 and 2010 and the "Top 100 Hospital, Performance Leaders Award" in 2007 from Thomson Reuters. (DSFOF, ¶ 32.) The hospital also received the "NRC Innovative Best Practice Award" for outstanding best practices that result in significant improvements in patient-centered care and healthcare outcomes for 2012 and 2013. (DSFOF, ¶ 32.) The Meriter marks have been used extensively and consistently on Meriter's signage, marketing and business documents since 1987. (DSFOF, ¶ 33.)

### C.    Harm to UnityPoint Health if an Injunction is Issued

If precluded from effectuating the name change for the Meriter-branded hospital and clinics described above, UnityPoint Health will suffer significant harm. (DSFOF, ¶ 34.) UnityPoint Health's strategy for marketing its regional health system would be frustrated. UnityPoint Health would be required to re-brand and design different marketing pieces to be tailored specifically for the Southern Wisconsin market. (DSFOF, ¶ 34.) There would also be required changes for UnityPoint Health's Dubuque, Iowa (Finley), and Quad City Iowa and Illinois (Trinity) hospitals and clinics, which together serve over 2400 patients who reside across

the border in Wisconsin and have been receiving UnityPoint Health materials for the past nine months.  (DSFOF, ¶ 35.)  UnityPoint Health's affiliated hospital in Dubuque could no longer reasonably market its services because it would be prevented from airing any radio or TV spots that air on stations or channels that cross the border into Wisconsin.  (DSFOF, ¶ 35.)  Newspaper and magazine advertising would be similarly affected.  (DSFOF, ¶ 35.)  Internet communications and website content and design would have to be changed.  (DSFOF, ¶ 35.)   In fact, all media through which UnityPoint Health has been advertising since April 2013 that has viewers, listeners, and subscribers in the state of Wisconsin would need to be changed.  (DSFOF, ¶ 35.) Likewise, UnityPoint Health's ability to communicate directly with its Wisconsin patients would be impaired.  For example, UnityPoint Health sent newsletters to 6,128 Wisconsin addresses three times in 2013, all after the re-branding occurred.  (DSFOF, ¶ 36.)  If an injunction were issued, UnityPoint Health would be prevented from continuing to send these newsletters to these households.  (DSFOF, ¶ 36.)

A foundational part of UnityPoint Health's strategy with its re-naming and re-branding plans is to portray itself as a single health system providing consistent healthcare services in all of its regions. (DSFOF, ¶ 37.)  Having a consistent image and brand to portray the system in the same manner to payers, employers, our patients and the public is a basic part of this strategy. (DSFOF, ¶ 37.)  To the extent UnityPoint Health has to change this otherwise consistent appearance in Southern Wisconsin, a part of Unity Point Health's strategy is lost and this consistent message and image is not able to be provided to Southern Wisconsin. (DSFOF, ¶ 38.) UnityPoint Health believes this is a loss for UnityPoint Health and for Southern Wisconsin residents.  (DSFOF, ¶ 39.)

Additionally, an injunction would likely damage Meriter UnityPoint Health's reputation in Wisconsin and be perceived as a sign of inconsistency and/or instability by patients and the public. The affiliation was broadly and publicly announced on October 10, 2013. (DSFOF, ¶ 40.)   Consequently Meriter UnityPoint Healths's patients and the public have already been informed that Meriter is going to become part of the UnityPoint Health family, and have been advised of the benefits of that relationship. For example, Meriter has explained on its website that "[t]he affiliation will allow Meriter to advance its commitment to high-quality, local patient care through shared best practices with UnityPoint Health's award-winning providers. Meriter will also gain the value of being part of a larger system, helping to lower the overall cost of care." (DSFOF, ¶ 41.)

An injunction that precludes Meriter from associating itself with UnityPoint Health in its branding and making use of the "Meriter UnityPoint Health" name will cast Meriter in a negative light and likely be viewed by consumers, including existing Meriter patients, as a sign Meriter is unstable and unable to adapt to the changes currently facing the health care industry. (DSFOF, ¶ 42.)

If unable to use the Meriter UnityPoint Health name, Meriter will also incur additional costs in marketing, advertising and promotion because Meriter will not be able to use UnityPoint Health prepared materials that otherwise could be used by Meriter to promote itself. (DSFOF, ¶ 43.)   Meriter will incur additional costs in administrative time determining how to comply with the Court's ruling and, at the same time, be part of the UnityPoint Health organization, which will not likely be affected by the Court's ruling as to UnityPoint Health's other markets. (DSFOF, ¶ 43.)   Meriter and UnityPoint Health wish to enhance Meriter's services and products, increase access to quality, high value healthcare services and provide care coordination services

that improve the patients' experience. (DSFOF, ¶ 44.)   A part of this plan includes the image of the entity providing the services. This image needs to be a consistent, stable image and when Meriter makes representations to the public about its affiliation plans, Meriter has a vital interest in following through with those plans in a consistent manner. (DSFOF, ¶ 44.) Changing plans can reduce the confidence that the public, and Meriter's patients, have with Meriter. (DSFOF, ¶ 44.)   Meriter UnityPoint Health's branding plan utilizing the Meriter name and logo together with the UnityPoint Health name and logo is intended to present Meriter in such a manner as to be consistent with our prior representation of Meriter's affiliation with UnityPoint Health. (DSFOF, ¶ 45.) Further reduction of the visibility or depiction given to UnityPoint Health or further restriction on the ability to use UnityPoint Health in Meriter's markets would cause damage to Meriter in that it would appear to be inconsistent in its representation, presentation and image. (DSFOF, ¶ 46.)   Meriter has used the exact same name for over 26 years. (DSFOF, ¶ 47.) To require a change to the way in which Meriter UnityPoint Health holds itself out to the public would cause significant harm and expense particularly in light of the recent public announcements.  (DSFOF, ¶ 48.)

### D.   Unity Health Insurance's Claim of Trademark Infringement

#### 1.   Unity Health Insurance's Use of the Alleged Trademark

Unity Health Insurance asserts that UnityPoint Health's use of its "UnityPoint" trademark in Wisconsin infringes Unity Health Insurance's purported common law trademark rights in and to the mark "Unity." As demonstrated below, however, throughout its history Unity Health Insurance has never branded itself as "Unity" alone and thus has no common law rights in this mark. Rather, beginning in 1995, Unity Health Insurance branded itself as "Unity Health Plans." (DSFOF, ¶ 49.) Thereafter, in 2002, Unity Health Insurance changed its d/b/a to "Unity Health Insurance," and in 2005 when Unity Health Insurance wanted to further promote its integral

relationship with UW Health, it began branding itself as "Unity Health Insurance, affiliated with UW Health."[2] (DSFOF, ¶ 50.)  As explained by Unity Health Insurance's CEO, Unity Health Insurance specifically utilizes the large letter "U" to signify "University" and chose the coloring of its logo to represent "Badger Red." (DSFOF, ¶ 51.)  As made abundantly clear by Mr. Bolz and Unity Health Insurance's marketing materials, at all times since at least 2005, Unity Health Insurance has made a concerted effort to be known as a part of UW Health, not separately known as "Unity" as it now alleges in this action.  (DSFOF, ¶ 51, 52.)

Further, all marketing, promotional materials and business materials utilize these brand names and logos and all radio advertising emphasizes the names "Unity Health Plans" or "Unity Health Insurance." (DSFOF, ¶ 53.)  In fact, Unity Health Insurance's communications with government officials emphasize Unity Health Insurance's desire to be branded, not as "Unity," but as "Unity Health Insurance." (DSFOF, ¶ 54.)  What is more, Unity Health Insurance has never taken any action to *protect* the term "Unity" by utilizing any "TM" notice or filing for state or federal trademark protection, despite a clear knowledge of the trademark protection process at both the state and federal level.  (DSFOF, ¶ 55-57.)  Indeed, the only time Unity Health Insurance ever sought protection of its brand was when it filed a now abandoned federal trademark application for the mark "Unity Health Plans." (DSFOF, ¶¶ 57-58.)

In sum, all of Unity Health Insurance's actions between 1995 and 2013 demonstrate that it has no trademark rights in "Unity" alone to even assert in this litigation.

2.    Alleged "Confusion" Incidents

---

[2] "UW Health" or University of Wisconsin Health is, to UnityPoint Health's information and belief, an entity that serves to oversee and coordinate the activities of the University of Wisconsin Medical Foundation ("UWMF"), the University of Wisconsin Hospitals and Clinics and the University of Wisconsin School of Medicine & Public Health.  Upon information and belief, Unity Health Insurance is owned by UW Health entities, including UWMF.





And all of this occurred during a time where

consumers were not even privy to the vast distinctions in branding between Meriter UnityPoint

Health and Unity Health Insurance.  Once viewed in the context of how these entities will in fact

be branded in Wisconsin, there can be no doubt that no likelihood of confusion exists.

**III.    ARGUMENT**

    **A.    The Legal Standard for Preliminary Injunctions**

As this Court has held "'[t]he granting of a preliminary injunction is an exercise of a very

far-reaching power, never to be indulged in except in a case clearly demanding it.'"  *Carter v.*

*Radtke*, Case No. 09-cv-437-wmc, 2011 U.S. Dist. LEXIS 70439, at *5 (W.D. Wis. 2011)

(quoting *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 389 (7th Cir. 1984)); *see*

*also Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) ("[a]

preliminary injunction is a *very serious remedy, never to be indulged in except in a case clearly

demanding it.*") (emphasis added); *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176,

1184 (7th Cir. 1989) (emphasis added); *see also* 5 J. THOMAS MCCARTHY, MCCARTHY ON

TRADEMARKS AND UNFAIR COMPETITION § 30:30 (4th ed. 2003) (hereinafter "MCCARTHY ON

TRADEMARKS") (citing *Barbecue Marx*, 235 F.3d 1041; *Schwinn Bicycle*, 870 F.2d 1176).

     In evaluating whether this very serious remedy should be granted, this Court considers

whether Unity Health Insurance has adequately demonstrated that:  (1) it has a reasonable

likelihood of success on the merits of its claim; (2) no adequate remedy at law exists and it will

suffer irreparable harm if preliminary injunctive relief is denied; (3) the irreparable harm it will

suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party

will suffer if the preliminary injunction is granted; and (4) the preliminary injunction will not

harm the public interest. *Platinum Home Mortgage Corp. v. Platinum Fin. Grp. Inc.*, 149 F.3d

722, 725 (7th Cir. 1998) (citing *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d

1210, 1219 (7th Cir. 1997)).  The threshold consideration in a motion for a preliminary

injunction is the moving party's likelihood of success on the merits of the underlying claim. *Rust

Environment*, 131 F.3d at 1213.  Without a showing of reasonable likelihood of success on the

merits, the other factors need not be addressed. *Abbot Labs. v. Mead Johnson & Co.*, 971 F.2d 6,

11-12 (7th Cir. 1992).

     To show a reasonable likelihood of success on its Section 1125(a) Lanham Act claim,

Unity Health Insurance must show both that it is the owner of a valid and protectable mark and

that the mark has been infringed. *See Platinum Home Mortgage*, 149 F.3d at 726; *Echo Travel,

Inc. v. Travel Associates, Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989); *see also* 2 MCCARTHY ON

TRADEMARKS § 15:32. As set forth below, there is little likelihood that Unity Health Insurance will succeed on the merits of its Lanham Act claim. As an initial matter, Unity Health Insurance has not met its burden to prove it has a valid and protectable trademark in "Unity" alone. Unity Health Insurance has also failed to demonstrate that there is any likelihood that an <u>appreciable number</u> of ordinary, prudent purchasers or prospective purchasers would be misled or confused as to the source, sponsorship, affiliation or approval of the services offered by Meriter UnityPoint Health and those offered by Unity Health Insurance. *See Rust Environment*, 131 F.3d at 1219. Because Unity Health Insurance cannot satisfy this prerequisite, the Court need not inquire as to any of the other preliminary injunction factors, and should deny the requested preliminary injunction. *Abbot Labs.*, 971 F.2d at 11-12. Still further, because the balance of harms favors UnityPoint Health, no injunction should be issued.

> **B.     Unity Health Insurance has not Established that It has a Reasonable Likelihood of Success on the Merits**

> > 1.     <u>Unity Health Insurance has not Established that It has a Valid Protectable Mark in the Term "Unity"</u>

The precursor to any trademark infringement or false designation action under Section 43(a) of the Lanham Act, of course, is that Unity Health Insurance has protectable trademark rights. *Platinum Home Mortgage*, 149 F.3d at 726. For a federally registered trademark, such rights may be presumed.[4] 15 U.S.C. § 1115(a). However, a plaintiff claiming common law rights has a greater burden of proof, as there are no applicable presumptions. *See Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1003 (8th Cir. 2005) ("Because none of

---

[4] Notably, Unity Health Insurance does not have a federal registration of the mark "Unity," and indeed its previous attempts to register a variant of this mark were rejected by the USPTO. (DSFOF, ¶ 57-59.)

the marks at issue has been federally registered . . ., [the plaintiff] *bears the burden* of establishing that its marks are protectable under trademark law. . .") (emphasis added).

Here, Unity Health Insurance alleges that it has common law trademark rights in the term "Unity." Its argument is that, although it has altered use of its designation over time, the common theme is the term "Unity" and thus this has become a protectable trademark.[5] (Dkt. 11 at 8-10.) Common law trademark rights, however, are only acquired through *use of the mark* that is sought to be protected. *See First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044-45 (8th Cir. 1996); *see also*, *DSMR, LLC v. Goldberg*, 2004 U.S. Dist. LEXIS 4879, at \*13-14 (N.D. Ill. Mar. 24, 2004) (under the common law, "ownership is conferred on 'the person who employs the 'first use of a mark'" that is sufficient to "identify or distinguish the marked goods" in public); *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, Case No. 11-C-861, 2014 U.S. Dist. LEXIS 4549 (W.D. Wis. Jan 14, 2014) ("[A]n entity only acquires rights in a trademark through commercial use of the mark . . .") Unity Health Insurance has proffered no evidence to show that prior to October 10, 2013, it ever branded itself as "Unity" standing alone, and thus it has failed to establish that it has a valid, protectable trademark in the mark "Unity" alone.

---

[5] Unity Health Insurance also argues that because the term "Unity" is "arbitrary" it is inherently distinctive and therefore requires no additional showing of distinctiveness in order to be afforded protection. (Dkt. 11 at 8-9.) This contention is unfounded. First, as shown in Unity Health Insurance's documents, "Unity" is not arbitrary, but rather descriptive as it was specifically adopted because it meant things like "all inclusive," "*Unified* approach," "connected employers, employees, physicians and hospitals," and "the name Unity Health Plans works well in the short term – three partners *unifying*." (emphasis added). (DSFOF, ¶ 57-59.) Second, even *assuming arguendo*, the mark was inherently distinctive for Unity Health Insurance's services, "even an 'inherently distinctive' word or design does not achieve trademark status unless it is used as a trademark." 1 MCCARTHY ON TRADEMARKS § 3:3. "[A] designation is not likely to be perceived as a mark of origin unless it is repetitively used, as opposed to only occasional and isolated use." *Id.*; *see also Edsal Mfg. Co. v. Vault Brands, Inc.*, Case No. 11-C-9287, 2012 U.S. Dist. LEXIS 163479, at \*12-13 (N.D. Ill. Nov. 15, 2010) (citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 755 (6th Cir. 1998) ("Consistent and repetitive use as an indicator of sources is the hallmark of a trademark.")

a.   Unity Health Insurance's marketing and business materials demonstrate Unity Health Insurance does not have rights in "Unity" alone

A review of Unity Health Insurance's business and marketing materials—e.g., its Provider Directories, Member Handbooks, Health Plan Report Cards, invoices, correspondence with members, signage and newspaper, television and radio advertising—demonstrates that between 1995 and today, Unity Health Insurance has always branded itself as "Unity" <u>in conjunction with other terms</u> such as "Health Plans," "Health Insurance" and "Health Insurance affiliated with UW Health," as shown below:



| 1995 | 2002 | 2005-Present |

(DSFOF, ¶ 49-54.)

Likewise, its domain name is <u>www.unityhealth.org</u>, not <u>www.unity.org</u>.  This type of usage simply does not constitute the type of proper trademark use that would entitle Unity Health Insurance to claim exclusive rights in "Unity."  *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (holding "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)"); *see Johnny Blastoff Inc. v. Los Angeles Rams Football Co.*, Case No. 97-C-155-C, 1998 U.S. Dist. LEXIS 11919, at *42 (W.D. Wis. June 24, 1998) (noting to acquire protectable rights in a certain trademark a party's use of the mark must be "sufficiently public to identify or distinguish the marked goods in an

16

appropriate segment of the public mind as those of the adopted mark"); *see also Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474 (S.D.N.Y. 2002) (denying the plaintiff's claim for infringement of their unregistered trademarks where the plaintiff had not established that GLACIER, standing alone and apart from TETON, identified the plaintiff's product to an appreciable number of consumers); *In re Int'l Nickel Co.*, 48 C.C.P.A. 701, 127 U.S.P.Q. 331 (1960) (holding for purposes of trademark renewal that use of "Ni-Tensyliron" did not constitute trademark use of "Ni-Tensyl"); *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 755 (6th Cir. 1998) ("Consistent and repetitive use as an indicator of source is the hallmark of a trademark."); *Self-Realization Fellowship Church v. Ananda Church of Self- Realization*, 59 F.3d 902, 907 (9th Cir. 1995) (concluding that evidence did "not create a genuine issue of fact about trademark use" where it did not use the claimed mark "in a manner consistent enough to be an identifying mark"); *In re Vicki Roberts*, 87 U.S.P.Q.2d 1474, 2008 WL 1944634, at *3–4 (T.T.A.B. 2008) (noting that, in order to show a claimed mark was used in commerce, the supporting evidence must show that "*a substantially exact representation*" of the claimed mark was used, and rejecting the contention that documents showing use of the terms RESTMYCASE and I REST MY CASE demonstrated use of the claimed mark, IRESTMYCASE) (emphasis added); *In re Yale Sportsware Corp.*, 88 U.S.P.Q.2d 1121, 2008 WL 2675684, at *3–5 (T.T.A.B. 2008) (affirming the refusal to register the phrase UPPER 90 as a mark where the applicant actually used the phrase UPPER 90° in commerce); ROBERT LIND *ET AL.*, 3 ENTERTAINMENT LAW 3D: LEGAL CONCEPTS AND BUSINESS PRACTICES § 17:4 (a designation claimed as a mark "must be used in a manner *sufficiently consistent* to be understood by the public as an identifying mark" (emphasis added). Because Unity Health Insurance has not established that "Unity" standing alone and apart from "Health Insurance"

17

identifies its services to an appreciable number of consumers, it has not demonstrated that its alleged mark is protectable. (Declaration of Wayne Adams ("Adams Dec."), ¶ 29).

> b.    Unity Health Insurance never provided any public notice that it intended to have trademark rights in "Unity" alone

Furthermore, Unity Health Insurance's actions belie the claim that it ever intended "Unity" alone to be a trademark. As an initial matter, as shown in Unity Health Insurance's documents, Unity Health Insurance has never marked the word "Unity" with a "TM" to provide notice that it claims trademark rights in this word. (DSFOF, ¶ 55.) Moreover, Unity Health Insurance has never taken any steps to register the name "Unity" alone at either the state or federal level, despite the fact that Unity Health Insurance certainly knows how to protect marks it deems protectable. Indeed, Unity Health Insurance has filed at least nine (9) state trademark applications for various trademarks, including "HealthyU," "Live for Your Life," "Fitness First," "Wellness First," "Self Referral HMO," and "9 Months and More." (DSFOF, ¶ 56.)

Significantly, when Unity Health Insurance actually sought federal trademark registration of its brand on April 28, 1995, it did not file for UNITY alone, but rather filed for UNITY HEALTH PLANS.[6] (DSFOF, ¶ 57.) This application, Serial No. 74/668,228, was later abandoned after Unity Health Insurance failed to respond to an office action issued by the United States Patent and Trademark Office Trademark Examiner, and no further application for any "Unity"-formative mark was filed by Unity Health Insurance. (DSFOF, ¶ 58.) Had Unity Health

---

[6] It is noted that the full file history for Application Serial No. 74/668,228 for the mark Unity Health Plans is no longer available from the USPTO as it was abandoned in 1997 and all records were subsequently destroyed. According to Mr. Bolz, the company's file no longer exists either. (DSFOF, ¶ 59.) To be sure, the most likely reason an applicant fails to respond to an office action is that it recognizes that the examiner has raised an objection as to either likelihood of confusion or descriptiveness which cannot be overcome. But for whatever reason, Unity Health Insurance allowed its application to go abandoned.

Insurance believed that "Unity" alone was its trademark, it begs the question why they, as a trademark savvy company, never sought to protect this mark on either a state or federal level?

Still further, in communicating with officials for the state of Wisconsin, Unity Health Insurance also made clear that its name was something other than "Unity" alone. By way of example, in 2002, Unity Health Insurance, in responding to a request from a Contracts Specialist for the state of Wisconsin stated:

> Our legal corporate name remains as Unity Health Plans Insurance Corporation and there are no plans to change it. I believe that is the name I used on our contract.
>
> Last August/September (2001) we began using Unity Health Insurance in place of Unity Health Plans. We would like you to begin using Unity Health Insurance whenever you don't require our legal name. This could be especially helpful in recipient communications *because hopefully our brand awareness campaigns are working and more people now identify with us as Unity Health Insurance.*

(DSFOF, ¶ 54.) (emphasis added).

As Unity Health Insurance cannot make a showing sufficient to establish the existence of an element essential to its case, namely that it acquired rights in the mark "Unity," it does not meet its burden to prove it has a reasonable likelihood of success on the merits on its Lanham Act claims. For this reason alone, the motion for preliminary injunction should be denied.

2.   Unity Health Insurance has not Established a Likelihood of Confusion Exists

Even if Unity Health Insurance could establish that it has acquired rights in the mark "Unity"—which it cannot—Unity Health Insurance cannot prove it has a reasonable likelihood of success on the merits because it also has not established a likelihood of confusion exists. "The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among an appreciable number of the relevant class of customers and potential customers." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,*

978 F.2d 947, 957 (7th Cir. 1992); *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1219 (7th Cir. 1997). In determining whether a likelihood of confusion exists between two trademarks, the Court of Appeals for the Seventh Circuit considers the following seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products or services; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and (7) intent of the defendant to "palm off his product as that of another." *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). Likelihood of confusion is a question of fact. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir.1985).

While the likelihood of confusion test is an equitable balancing test and no single factor is dispositive, *see Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989), courts in the Seventh Circuit have found three factors—similarity of the marks, the defendant's intent, and actual confusion—to be the most important. *Barbecue Marx,* 235 F.3d at 1044; *Eldon Indus., Inc. v. Rubbermaid, Inc.*, 735 F. Supp. 786, 818 (N.D. Ill. 1990) (citing *Zeibert Int'l Corp. v. After Market Assocs., Inc.*, 802 F.2d 220, 226 (7th Cir. 1986)); *G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F. Supp. 1436, 1470 (E.D. Wis. 1987) (citing *Zeibert,* 802 F.2d at 226). In this case, application of the Seventh Circuit's primary factors, as well as the majority of other factors, demonstrates that there is no reasonable likelihood that Unity Health Insurance can establish a likelihood of confusion because the parties' marks are vastly different in appearance and connotation, there is no probative evidence of actual confusion, and there is no evidence of intent to palm off. Moreover, Unity Health Insurance's alleged "Unity" mark is weak and consumers will exercise a reasonable degree of care, thus making it unlikely that an appreciable number of consumers will be confused.

a.      *The Marks are not similar in sight, sound or meaning*

Unity Health Insurance contends that the comparison for likelihood of confusion

purposes should be "Unity" versus "UnityPoint." This assertion violates well-settled trademark

law analysis. The "anti-dissection" rule requires that conflicting marks be compared in their

entireties. It is the impression that a trademark as a whole creates on the reasonably prudent

buyer, and not the component parts, that is important. *Estate of Beckwith, Inc. v. Comm'r of*

*Patents*, 252 U.S. 538, 545-546 (1920) ("The commercial impression of a trade-mark is derived

from it as a whole, not from its elements separated and considered in detail."); *see also Barbecue*

*Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (noting that even where the

marks were similar in sound, the "written form" of the marks "significantly undercut[] the

strength of [the plaintiff's] argument that the marks are similar in appearance and suggestion);

*Nike Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225, 1230 (7th Cir. 1993) (citing *Universal City*

*Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984)); 3 MCCARTHY ON

TRADEMARKS § 23.41. Equally important is the basic tenet that marks must be compared in light

of what happens in the marketplace. *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)

(quoting *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)). In short, the

marks must be so similar that it is likely or probable, not just possible, that consumers, when

presented with the marks singly, rather than side-by-side, would confuse them. *Henri's Food*

*Products Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983).

Thus, in the instant case the proper comparison is between the following marks as they

are encountered by consumers in the marketplace—on signage, on webpages, and on each

parties' marketing and business materials:

21

  

and



In looking at these marks as they are encountered by consumers, they are starkly different. Unity Health Insurance only complains about the only overlap of a single word, "unity." However, each mark includes a number of other distinguishing features which, when viewed as a whole, provide a distinctly different impression. 9Adams Dec. ¶ 25).

In addition to the word "unity," UnityPoint Health's proposed branding for its new Meriter hospital and affiliated clinics includes at least five other features:

(1)    the distinctive term "Point" as part of a compound word, "UnityPoint";

(2)    the fanciful term "Meriter"—a term which reveals nothing about the nature or characteristics of the underlying services, is registered on the Principal Register of the USPTO, and has been used throughout Central and Southern Wisconsin since 1987;

(3)    the historic Greek "Meriter cross" between the "I" and "T" in "Meriter" which has been a part of Meriter's brand since 1987;

(4)    Iowa Health Systems' historic blue Greek cross design which has been used in commerce since 1994; and

(5)    a blue and white color scheme that is readily identifiable with both Madison-based Meriter and Iowa-based UnityPoint Health.

(DSFOF, ¶¶ 4, 11, 17, 29); Adams Dec. ¶¶ 29, 30. Likewise, in addition to the word "unity," Unity Health Insurance's branding includes at least five other features:

(1)    the large "U" meant to signify "University,"

22

(2)     the descriptive term "Health Insurance" which serves to identify the services offered under the mark;

(3)     the distinctive wording "UW Health" as an express representation of its affiliation with UW Health; and

(4)     bright red coloring for both the word "Unity" and the term "UW Health" meant to signify "badger red."

(DSFOF, ¶ 56); (Adams Dec. ¶¶ 25, 28). These highly distinctive logos, together with stark color contrasts, significantly reduce any likelihood of confusion. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001) ("Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion."); *see also Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000) ("Our inquiry does not end with a comparison of the marks themselves. Rather, in determining whether two marks are confusingly similar, we must 'appraise the overall impression created by ... the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers'."); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (placement of corporate logos, colors and typefaces diminishes the likelihood of confusion; affirming summary judgment dismissing claims under § 43(a) of the Lanham Act); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("Even if the trade names are similar, the likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct.") Further, both companies market their brands "UnityPoint Health" or "Unity Health Insurance" with other distinctive brands—in the case of UnityPoint Health, Meriter and in a co-branding situation PPIC—and in the case of Unity Health Insurance, UW Health. 9Adams Dec. ¶¶ 28, 30, 31). Use of these distinctive terms further serves to eliminate any possibility of confusion. *Sullivan v. CBS Corp.*, 385 F.3d at 778; *Ziebart International Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 227 (7th Cir. 1986) ("Prominent display of different names on the marks has

23

been held to reduce the likelihood of confusion even where, unlike here, the marks are otherwise similar.")

For Unity Health Insurance's argument to even have traction, it implicitly assumes that "Unity" is the dominant feature of UnityPoint Health's proposed branding when it, in fact, it is not even a "stand alone" word in the brand.  (Adams Dec. ¶ 27).  Indeed, even if it were the most "prominent" feature on UnityPoint Health's brand, and it most certainly is not, sharing a prominent feature does not excuse analyzing two conflicting marks in their entireties.  *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F.Supp. 2d 815, 880 (N.D. Ill. 1999); *Massey Junior College, Inc. v. Fashion Institute of Technology*, 492 F.2d 1399, 1402 (C.C.P.A. 1994).  Sharing a single word by itself does not create a likelihood of confusion or deception.  3 CALLMAN, LAW OF TRADEMARKS § 82.1 (i), at 722 ("whether an addition is sufficient to prevent confusion in a particular instance depends upon the strength of the main part of the mark and the distinctiveness of the additional features.  Where a trademark is itself weak, minor additions may effectively negate any confusing similarity.")  There is simply no rule that confusion is automatically likely if a junior user has a mark that contains in part the whole of another's mark.  *See Planet Hollywood*, 80 F. Supp. 2d at 880 (finding no confusing similarity between two marks sharing the word "HOLLYWOOD."); *Colgate-Palmolive Co. v. Carter-Wallace, Inc.*, 432 F.2d 1400, 1402 (C.C.P.A. 1970) (PEAK PERIOD not confusingly similar to PEAK).  Indeed, any argument to the contrary is in direct contradiction to the "anti-dissection" rule.  *Estate of Beckwith*, 252 U.S. at 545-546; *Barbecue Marx*, 235 F.3d at 1044; 3 MCCARTHY ON TRADEMARKS § 23.41.  Viewed as a whole and in the context in which they will be viewed by consumers, it is not likely that consumers will be confused.  Thus this factor tips decidedly in favor of UnityPoint Health.

24

b.   *Unity Health Insurance has Proffered No Probative Evidence of Actual Confusion*

Likelihood of confusion is synonymous with *probable confusion*, not possible confusion. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir. 1995). Thus, when determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010).

In support of its claim of actual confusion, Unity Health Insurance offers audio clips from six (6) individuals Unity Health Insurance claims were actually confused, the affidavit of one (1) Unity Health Insurance member, and two (2) affidavits from members of its customer service department alleging that there have been "some" or "several" incidents of confusion. None of this "evidence" is probative because it is either vague, ambiguous hearsay, demonstrates on its face that callers were not confused, or is simply *de minimus* and therefore may be disregarded. (Adams Dec. ¶¶ 49, 50). *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 686 (7th Cir. 2001) (discounting employee's hearsay account of statements of an unidentified declarant); *Packman*, 267 F.3d at 645 ("Even if the four callers fell into the relevant category of consumers, however, the district court properly discounted such *de minimis* evidence of confusion." (citations omitted)). Further, Unity Health Insurance has not proffered any survey evidence to support a finding of actual confusion. *Barbecue Marx*, 235 F.3d at 1046 (holding that even when a contested name has not yet appeared in the market this impediment does not excuse the moving party from the requirement that it provide some evidence of "actual confusion," explaining that a survey asking a hypothetical question or testimony from a marketing expert could have satisfied this burden). Indeed, when the sum total of Unity Health Insurance's evidence is evaluated, it is clear confusion is unlikely.

25

i.    The accounts of alleged confusion by any unknown customers are vague, ambiguous and nothing more than hearsay

As an initial matter, Unity Health Insurance offers the declaration testimony of its Director of Customer Relations, Tonya Wiegert, to claim that "[a]s of December 10, 2013, Unity customer service received at least 3 to 4 phone calls from Unity members wanting to know if Unity Point [sic] was the same entity as Unity" and that "[a]s of December 10, 2013, Unity customer service received additional phone calls from Unity members wanting to know if Unity's healthcare insurance plans would now cover all Meriter healthcare services since they believed that Unity had merged with Meriter." (Dkt. No. 9, ¶¶ 3, 5.) Notably, not a single "confused" individual is identified by name by Ms. Wiegert. Courts in this circuit have consistently rejected similar types of vague summaries of hearsay statements by <u>unidentified</u> consumers. *See, e.g.,* *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1331 (7th Cir. 1993) (refusing to craft[] a new hearsay exception to the Federal Rules of Evidence for paraphrases of state of mind declarations by unknown declarants); *CAE*, 267 F.3d at 686 (discounting employee's hearsay account of statements of an unidentified declarant); *S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d at 878, 893 (N.D. Ill. 1998) (rejecting hearsay testimony of "vague allegations" of confusion

on the part of "unknown numbers of consumers").[7]  This Court should thus disregard this alleged

evidence.

        ii.    A review of the audio clips for three individuals
             demonstrates there was no confusion as to source or
             affiliation



*Nike*, 6 F.3d at 1229 ("We are
dealing here with customer confusion when choosing to purchase, or not purchase, the items, not
public confusion at viewing them from afar."); *Electronic Design & Sales, Inc. v. Electronic
Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir. 1992) ("[W]e do not construe this deletion [of the
word "purchasers" in the 1962 amendments] to suggest, much less compel, that purchaser
confusion is no longer the primary focus of the inquiry.  Instead, we believe that, at least in the
case of goods and services that are sold, the inquiry generally will turn on whether actual or
potential 'purchasers' are confused."); *Ortho Pharm. Corp. v. Am. Cyanamid Co.*, 361 F. Supp.
1032, 1042 n.13, 1043 (D.N.J. 1973) (noting that legislative history indicates purpose of 1962
amendments to be to broaden scope of situations that would result in infringement but holding
that likelihood of confusion must be determined with reference to "the actual consumers of the
product in question") (citation omitted); *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 539-40
(S.D.N.Y. 2002) (discounting e-mails from industry professionals where it was possible that
persons comparing marks in abstract might be confused but where differences in products made
it impossible that consumers could be confused); RESTATEMENT (THIRD) OF UNFAIR
COMPETITION § 20 cmt. b at 210 (1995) (providing that confusion will not be actionable unless it
"threaten[s] the commercial interests of the owner of the mark" thus indicating that confusion
must be by consumers or potential consumers).



Notably, Unity Health Insurance ▮▮▮▮▮ proffered a declaration for Ms. Wodziak—one in which the implication was that Ms. Wodziak was confused:

1. I am a resident of Dane County, am over 18 years of age and am not a party to this lawsuit. Additionally, I am not employed by Unity or UW Health and have no connection to this lawsuit. I make this declaration based on my personal knowledge and believe all statements in here are true and accurate.

2. I have health insurance through Unity Health.

3. I received a letter about Meriter and UnityPoint merging.

4. I telephoned Unity on November 12, 2013 to inquire about how to enroll a newborn on to my current plan and how this merger would affect Unity's coverage at Meriter.

5. I was informed by a Unity Customer Service Representative that UnityPoint is not related to Unity Health, Meriter Hospital would still be in Unity's network, and I would not be affected by the Meriter and UnityPoint merge.

(Dkt. No. 10.) This declaration is at best incomplete and at worst misleading. It neglects to mention the exact question posed by Ms. Wodziak which clearly indicates that she was just trying to confirm if her medical services would still be covered by her policy after the affiliation of the Meriter and UnityPoint Health took place. Moreover while it states that Ms. Wodziak is "not employed by Unity or UW Health and have no connection to this lawsuit," it neglects to mention that Ms. Wodziak's husband Matthew, is a physician employed by UW Health.[8] (DSFOF, ¶ 39.) Nevertheless, even in this declaration there is no statement by Ms. Wodziak that she was in anyway confused as to source or affiliation.

---

8



### iii.    The remaining evidence of alleged confusion is *de minimis*

The only other evidence proffered by Unity Health Insurance is three additional audio clips that require interpretation as to the facts. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Taken together, these calls are insufficient to establish that a likelihood of confusion exists. (Adams Dec. ¶ 49).  With respect to the first, the law is clear that administrative error can be discounted. *Platinum Home Mortgage Corp. v. Platinum Fin. Grp. Inc.*, 149 F.3d 722, 729 (7th Cir. 1998) (evidence of actual confusion must refer to the confusion of reasonable and prudent consumers, and not confusion among sophisticated members of the mortgage service industry).  With respect to the second, as the D.C. Circuit observed in a trademark-infringement case predating the Lanham Act, trademark owners "cannot be protected

from all of the inadequacies of human thought and memory." *McGraw-Hill Pub. Co. v. American Aviation Associates, Inc.*, 117 F.2d 293, 295 (D.C. Cir. 1940).

Indeed, even if ███████████ are considered, they are simply insufficient to support a finding of likelihood of confusion because what is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion. *Platinum Home Mortg.*, 149 F.3d at 729 ("*de minimis* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion"); *Packman*, 267 F.3d at 645; *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 383 (7th Cir. 1976) ("[I]solated instances of actual confusion or misdirected mail have been held insufficient to sustain a finding of likelihood of confusion."); 4 McCarthy on Trademarks § 23:3.

Since October 10, 2013, when the Meriter-UnityPoint Health affiliation was first publicized, ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983) (holding that survey showing a 7.6 % rate of confusion weighs <u>against</u> a finding of likelihood of confusion); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 2013 (10th Cir. 2013) (net confusion rates of 7.5% and 7.3% were too low); *S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 697 (1st Cir. 1979) (finding 7.2% confusion unconvincing); *Master Clean, Inc. v. ServiceMaster Co.*, 181 F. Supp. 2d 821, 828 (S.D. Ohio 2002) (comparing an average of 550 calls per week with an estimated two confused

inquir[i]es per week and finding that this amount—0.36% or less than one percent—did not support a finding of actual confusion"); *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 657 (D. Md. 2002) ("finding one instance of alleged confusion for every 12,960 transactions (0.007%)") not sufficient to show actual confusion); *McGraw-Hill Pub. Co. v. American Aviation Associates, Inc.*, 117 F.2d 293, 295 (D.C. Cir. 1940) ("Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification.").

In the end, the only thing Unity Health Insurance has to offer is its speculative belief that confusion will occur. This is simply not enough. *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912 (7th Cir. 1996) (Because confusion is a factual matter, the plaintiff must produce proof; a theory about how consumers might be confused will not do, unless evidence supports the theory"); *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995) ("[o]ur point is only that a finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof").

To be sure, the lack of actual confusion leads to the inference that that there is not likelihood of confusion.[9] *Nike*, 6 F.3d at 1231 (noting that proof of actual confusion is not required to show likelihood of confusion but stating that "'it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion'")

---

[9] Unity Health Insurance's burden on this factor is not negated by the fact that UnityPoint Health has only recently entered the market. As an initial matter, the proposed affiliation was publicized as early as October 10, 2013, and the subject of ongoing press since that time, and thus there has been over three months during which actual confusion could have arisen. (DSFOF, ¶¶ 23-25.) Moreover, as the Seventh Circuit has previously held, even when a contested name has not yet appeared in the market this impediment does not excuse the moving party from the requirement that it provide some evidence of "actual confusion," explaining that a survey asking a hypothetical question or testimony from a marketing expert could have satisfied this burden. *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000).

(quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d Cir. 1979)).  Thus

this factor also weighs in favor of UnityPoint Health.

> c.   *Unity Health Insurance concedes there was no intent to "palm off"*

Unity Health Insurance outright concedes that it has no evidence that UnityPoint Health

wished to capitalize on Unity Health Insurance's alleged mark.  (Dkt. 11 at 24.)  And, of course,

no such evidence exists.  (Adams Dec. ¶ 31).  UnityPoint Health chose t this mark in 2011,

applied for federal trademark registration in April 2012, and did not even learn of the potential of

affiliating with Meriter until February 2013.[10]  (DSFOF, ¶ 19, 22.)  This factor likewise weighs

in favor of UnityPoint Health.

> d.   *The term "Unity" is a weak mark because it has not acquired*
> *secondary meaning and is used extensively by third-parties*

As noted above, UnityPoint Health maintains that Unity Health Insurance has failed to

meet the threshold requirement of establishing that it has any trademark rights in and to the word

"Unity."  However, even assuming *arguendo*, it has a valid trademark, the strength of that

mark—and hence the scope of protection to which it is entitled—is a separate inquiry.  The

stronger a mark, the more one is likely to associate similar marks and products with it.  A strong

mark therefore receives broader protection.  *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267

F.3d 660, 684 (7th Cir. 2001); 2 McCarthy on Trademarks §§ 11:73, 11:75.  "Where a party

---

[10] To the extent Unity Health Insurance argues that UnityPoint Health had "intent" because it
was aware of the existence of Unity Health Insurance prior to entering into the affiliation
agreement with Meriter, this argument in unfounded.  As an initial matter, UnityPoint Health had
no awareness of Unity Health Insurance's alleged trademark in the word "Unity" and certainly
had no reason to be aware of this since Unity Health Insurance took no action to provide public
notice of this claimed mark. Section II. B. 1.b., supra at 18.  Moreover, the Seventh Circuit has
repeatedly held that even awareness of a prior <u>trademark</u> does not support a finding of intent.
*Packman*, 267 F.3d at 644; *Barbecue Marx*, 235 F.3d at 1046.

uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights." *Id.* § 11:73 (citation omitted).

Courts look to secondary meaning to analyze the strength of the mark. *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 851 n. 11 (1982) (citation omitted) ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."). Secondary meaning exists when the mark used has come to indicate that the goods in connection with which it is used are the goods manufactured by the alleged owner. (*Id.*).

     i.  Unity Health Insurance has not acquired secondary meaning in "Unity"

Secondary meaning is a factual determination, proof of which "entails vigorous evidentiary requirements." *Thompson Medical v. Pfizer Inc.*, 753 F.2d 208, 217 (2nd Cir. 1985). "The burden of proof is on the party claiming exclusive rights in the designation." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990) (citation omitted). Unity Health Insurance attempts to demonstrate the strength of the mark by producing evidence of the extent of advertising it has done. As an initial matter there is no evidence that any of this money was spent to promote "Unity" alone as opposed to Unity Health Plans," "Unity Health Insurance" or "Unity Health Insurance, affiliated with UW Health." Still further, it is axiomatic that the test of secondary meaning is not the size of the expenditure used to create it but its effectiveness. *Platinum Home Mortgage Corp. v. Platinum Fin. Grp. Inc.*, 149 F.3d 722, 729 (7th Cir. 1998) (evidence of advertising and sales is entirely circumstantial, and that evidence does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark); *Henri's Food*

*Products Co. v. Kraft, Inc.*, 717 F.2d 352, 361-362 (7th Cir. 1983) (Obviously the amount of advertising expenditures is not probative of secondary meaning unless those advertising efforts are successful in entrenching the word sought to be protected in the minds of the consuming public); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1223 (2d Cir. 1987); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970) ("[A] 'large expenditure of money does not in itself create legally protectable rights.' [citation omitted]."). Unity Health Insurance has proffered no evidence to show that the consuming public "equates the word [Unity] with [Unity Health Insurance]" and thus cannot establish that the mark has acquired secondary meaning. *Henri's Food Products*, 717 F.2d at 361-62.

Here, Unity Health Insurance has not shown the effect, if any, its advertising has had on consumers recognizing Unity Health Insurance as simply "Unity."

ii. The term "Unity" is used extensively by third parties

Of value in the "strength of mark" analysis is the extent of third-party use and registration of the term or similar terms. *See McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir. 1986); *see also CAE*, 267 F.3d at 685. The more extensive the use and promotion of similar marks by third parties, the weaker the mark and less protection afforded. *See McGraw-Edison*, 787 F.2d at 1171; *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 634-35 (7th Cir. 1968) (finding that the "MUSTANG" mark was weak where several other producers had trademarked the mark for a variety of products); *First Sav. Bank, F.S.B. v. First Bank Sys.*, 101 F.3d 645, 654 (10th Cir. 1996) (recognizing "the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection"); *Universal Money Ctrs. Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1533-34

35

(10th Cir. 1994) (finding that the mark at issue in the case was relatively weak based on the use of the term by a significant number of entities); *Michael Caruso & Co. v. Estefan Enter., Inc.*, 994 F. Supp. 1454, 1459 (S.D. Fla. 1998) (defendant's evidence of extensive third-party use of the term "bongo" renders it unlikely that the mark will have strong trademark significance); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979) (wide use of mark "World" results in little likelihood of confusion); *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 448 (5th Cir. 1973) (common word "Holiday" is of weak trademark significance); *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954) (27 trademark registrations of "El Chico," along with the fact it was the name of a Moorish king of Granada in 1482, and is the name of a Mexican town and a river in the Philippines, make the term a weak trade name deserving limited protection); *S Indus., Inc. v. JL Audio, Inc.*, 29 F. Supp. 2d 878, 892 (N.D. Ill. 1998) (finding the plaintiff's mark weak where several other producers have used or currently use the "STEALTH" mark for a wide variety of products); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970).

Here, a review of the third-party usage of the term "Unity" and similar variants thereof in the health insurance field and in the larger "health care" industry demonstrates that this term is weak at best. (Adams Dec. ¶¶ 33, 36-47). Most significantly Unity Health Insurance <u>directly competes</u> with "UnitedHealthCare" in and around Southern Wisconsin. (DSFOF, ¶ 75.) The similarity of those names—for directly competing businesses in the same region—is demonstrated by the fact that the Unity Health Insurance customer service representatives get calls from UnitedHealthCare members "quite often." (DSFOF, ¶ 76.)   In fact, this is the "most common" mistake call received by Unity Health Insurance.  (DSFOF, ¶ 77.)

36

Further, as shown below, there are at least five (5) companies in the health care field using Unity or a similar variant as part of their name in Wisconsin, several in counties where Unity Health Insurance has members:

| Name | URL |
|------|-----|
| Unity Ltd | www.unityhospice.org |
| Unity Pharmacy | www.scmc.org/medical-services/pharmacy |
| Unity Clinic | www.scmc.org/about/hours-and-locations |
| Unity House for Men, Unity House for Women | www.gundersenhealth.org/behavioral-health/residential-treatment-centers |
| Unity Family Health and Services. | www.seniorcarauthority.com/assisted-living/wi/milwaukee/milwaukee/unity-family-health-and-services-llc |

(DSFOF, ¶ 78.)  In particular, the Unity hospice and palliative care facility--www.unityhospice.org--provides services right in Unity Health Insurance's back yard.  (DSFOF, ¶ 78.)  Still further, as shown below, the term Unity forms the part of at least seven (7) healthcare companies around the United States.  (DSFOF, ¶ 79.)

| Name | URL |
|------|-----|
| Unity Hospital | www.allinahealth.org/ahs/unity.nsf/ |
| Unity Hospice | www.unityhospice.com |
| Unity Health System | www.unityhealth.org/hospital |
| Unity Wellness Group LLC | http://www.unitywellnessgroup.com |
| Unity Medical Clinic | www.unitymedicalclinic.com |
| Unity Medical & Surgical Hospital | www.umsch.net |
| Unity Healthcare | www.unityhc.com/contact-us |

To the extent "unity" is protectable at all—which as demonstrated above it is not—"Unity" is a weak indicator of source and this factor weighs in favor of UnityPoint Health. (Adams Dec. ¶¶ 33-47).

e. *Consumers and potential consumers exercise a reasonable degree of care*

The degree of care factor seeks to distinguish how likely the relevant group of consumers is to distinguish between different products. The relevant question is whether consumers will "exercise a *reasonable* degree of care." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000) (emphasis added); *see also Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) ("where consumers are sophisticated, deliberative buyers, confusion is less likely"); *TV Land, L.P. v. Viacom International, Inc.*, 908 F. Supp. 543, 552 (N.D. Ill. 1995) (noting that by contrast, where the relevant group of consumers is likely to buy in haste or on impulse, confusion is more likely). "In considering this factor, [the Court] must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999).

As a general rule, "where 'the cost of the defendant's trademarked product is high, the courts assume that purchasers are likely to be more discriminating than they might otherwise be.' Moreover, . . . where the product involved was a low value item, the risk of confusion is greater. . . ." *Maxim's Limited v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985); *Nike*, 6 F.3d at 1230 ("In any event, we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the product information."); *CAE*, 267 F.3d at 683 ("[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases"); *Knaack Manufacturing Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 1001 (N.D. Ill. 1997) (finding that plaintiff had "failed to prove that consumers are not likely to exercise care in purchasing a $49 to $79 vehicle cover").

Additionally, certain purchasing decisions, regardless of the price level, may be more deliberative. *See, e.g., Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1356 (N.D. Ill. 1996) (finding high degree of care despite low price level of CDs and cassettes because consumers "are 'necessarily discriminating'" between different artists and different musical genres"); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000) (finding that because "we can expect that customers will exercise a reasonable degree of care when planning to dine at a restaurant of SMOKE DADDY's caliber" it "was clear error for the district court to weight this factor in favor of [plaintiff]"); (finding that newspaper purchasers would exercise some care when subscribing to a paper because "[c]ustomers who spend the money and effort to subscribe to a newspaper are likely to know which paper they are buying, and to complain if they get the wrong one." *Duluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1099 (8th Cir. 1996).

Here, there can be no question that consumers of both parties' services exercise a reasonable degree of care and discrimination in making purchasing decisions. (DSFOF, ¶ 80.) On the one hand, consumers of Unity Health Insurance's services are purchasing health insurance, a very expensive item in nearly anyone's budget. (DSFOF, ¶ 81.) *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154 (D. Colo. 2012) (noting that "individual insurance policies are not sold 'off the shelf.' Further, health insurance is not an inexpensive purchase, with an average consumer expecting to pay an average monthly premium of approximately $260 for about three years. Before signing up for an insurance policy, the consumer is presented with various coverage options that must be considered and expressly selected.") On the other hand, consumers of the Meriter UnityPoint Services are purchasing medical services—services where they interact with individuals who are at a minimum touching

their bodies during an annual physical and very often individuals prescribing them medication or performing some procedure on them. (DSFOF, ¶ 82.) *HealthONE of Denver*, 872 F. Supp. 2d at 1185 (finding that "[b]ecause the decision to purchase healthcare insurance and related services involves both the quality of the services and a significant financial commitment, purchasers are likely to exercise greater care and know with whom they are dealing.") (quoting *Humana, Inc. v. Humanomics, Inc.*, TTAB Opp. No. 71,097, 1987 TTAB LEXIS 59, 1987 WL 124301, *9 (T.T.A.B. 1987).

Most certainly, if purchases of restaurant services, CDs, newspapers, or $40-70 items are presumed by courts to be "discriminating decisions," so too this Court can presume that the purchase of medical or medical insurance is a discriminating decision. *Barbecue Marx*, 235 F.3d at 1045, *Tsiolis*, 946 F. Supp. at 1356, *Duluth News-Tribune*, 84 F.3d at 1099, *Nike Inc. v*, 6 F.3d at 1230; *Knaack Mfg.*, 955 F. Supp. at 1001.

> f.   *Under the circumstances of this case, the services offered by the parties, and the area and manner of concurrent use are sufficiently distinct*

"Closely related" products are those that "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 1000 (7th Cir. 1992) (The test for similarity of products or services is "'whether [they] are the kind the public attributes to a single source."') (quoting *McGraw-Edison Co.*, 787 F.2d at 1169; *see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988) (holding that a likelihood of confusion existed when the products were not identical but were sufficiently related to create an inference in consumers' minds that the products came *from the same source*) (emphasis added).

40

While health insurance services and medical services both fall generally under the same umbrella of healthcare services, and the parties offer services in the same geographic area, this relatedness must be considered in context and as perceived by the consuming public. As an initial matter, as demonstrated above Unity Health Insurance's purported "Unity" mark is "of such [a] non-arbitrary nature or so widely used" that it is at best a weak mark entitled to a very limited scope of protection, and the "public easily distinguishes slight differences in the marks under consideration as well as differences in the goods to which they are applied, even though the goods of the parties may be considered 'related.'" *Telemed Corp.* v. Tel-Med, Inc., 588 F.2d 213, 219 (7th Cir. 1978) (quoting *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1401 (C.C.P.A. 1974)). Perhaps even more importantly, if Unity Health Insurance is able to peacefully co-exist with UnitedHealthCare as a direct competitor and the Unity hospice and palliative care facility, it demonstrates that, despite the relatedness of the services and area of use, UnityPoint Health, branded as Meriter UnityPoint Health, can likewise peacefully co-exist with Unity Health Insurance, branded as Unity Health Insurance affiliated with UW Health.

In the end, five (5) of the seven (7) factors tip decidedly in favor of UnityPoint Health and the remaining two (2) either favor UnityPoint Health or are effectively neutral to the analysis. Thus, the record as a whole compels a conclusion that consumers of the parties' services are unlikely to be misled.

**E.       Unity Insurance Has Failed to Show It Will Suffer Irreparable Harm**

In the absence of a likelihood of confusion, it is impossible to make a finding of irreparable harm. *Microwave Systems Corp. v. Apple Computer, Inc.*, 126 F.Supp. 2d 1207, 1218 (S.D. Iowa 2000) (citing *United Indus. Corp. v. Clorox*, 140 F.3d 1175, 1183-84 (8th Cir.

1998)).  Here, as there is no probative evidence of likelihood of confusion, there is no irreparable

harm.  This factor as well weighs against the issuance of a preliminary injunction.

**F.     The Balance of Hardships and the Public Interest do not Favor Granting a
        Preliminary Injunction**

In the absence of a likelihood of confusion, there is no need to balance the harm

UnityPoint Health will suffer if an injunction is issued.  Assuming *arguendo* that this Court finds

that Unity Health Insurance has proven a reasonable likelihood of success on the merits, it first

must balance the harm UnityPoint Health will suffer as a result of an injunction being issued

prior to a full trial on the merits.  Here, as noted in the declarations of Kevin Vermeer and James

Woodward, UnityPoint Health will suffer significant harm both inside and outside of Wisconsin

where the injunction is sought.

A foundational tenet of UnityPoint Health's strategy with its re-naming and re-branding

plans is to portray itself as a single health system providing consistent healthcare services in all

of its regions.  (DSFOF, ¶ 37.)  Having a consistent image and brand to portray the system in the

same manner to payers, employers, patients and the public is a basic part of this strategy.

(DSFOF, ¶ 37.)  This overall strategy would be frustrated if an injunction were issued as

UnityPoint Health would be required to re-brand and design different marketing pieces to be

tailored specifically for the Southern Wisconsin market.  (DSFOF, ¶ 38.)  Indeed, this re-branding

would affect the UnityPoint Health hospitals and clinics located in Dubuque, Iowa and the Quad

Cities in Iowa and Illinois, which together serve over 2400 patients who reside across the border

in Wisconsin and have been receiving UnityPoint Health business and marketing materials since

April 2013.  (DSFOF, ¶ 35.)  By way of example, UnityPoint Health's affiliated hospital in

Dubuque could no longer reasonably market its services because it would be prevented from

sending directed mail, advertising in newspapers and magazines, or airing radio or TV spots across the border into Wisconsin. (DSFOF, ¶¶ 35-36.)

Furthermore, an injunction would likely damage UnityPoint Health's reputation in Wisconsin and be perceived as a sign of inconsistency and/or instability by patients and the public, as UnityPoint Health publicly announced its affiliation with Meriter in October 2013, which was published by numerous news sources, and promoted to all patients on October 8, 2013. (DSFOF, ¶ 38.) An injunction that precludes Meriter from associating itself with UnityPoint Health in its branding and making use of the "Meriter UnityPoint Health" name will cast Meriter in a negative light and be likely viewed by consumers, including existing Meriter patients, as a sign Meriter is unstable and unable to adapt to the changes currently facing the health care industry. (DSFOF, ¶ 42.) Meriter will also incur additional costs in marketing, advertising and promotion because Meriter will not be able to use UnityPoint Health prepared materials that otherwise could be used by Meriter to promote itself and it will incur additional costs in administrative time determining how to comply with the Court's ruling and, at the same time, be part of the UnityPoint Health organization. (DSFOF, ¶ 43.) Creating this perception in the market place does not serve the public interest. (DSFOF, ¶ 39.)

## IV.   CONCLUSION

Unity Health Insurance's motion for a preliminary injunction focuses myopically on a single word in its unregistered trademark. Since Unity Health Insurance cannot get past the threshold requirement of a reasonable likelihood of success on the merits—both because it has not proven that it even has trademark rights in "Unity" alone, and because it has not proven there is any likelihood that an appreciable number of consumers will be confused—its motion for a preliminary injunction should be denied. Still further, the balance of the harms also favors

43

UnityPoint Health and for this additional reason as well Unity Health Insurance's request for

injunction should be denied.

Edmund J. Sease
Jeffrey D. Harty
Christine Lebrón-Dykeman
Alexandria M. Christian
McKEE, VOORHEES & SEASE, P.L.C.
801 Grand Avenue, Suite 3200
Des Moines, IA 50309-2721
Phone:  515-288-3667
Fax:  515-288-1338
Email:  ed.sease@ipmvs.com
Email:  jeff.harty@ipmvs.com
Email:  christine.lebrondykeman@ipmvs.com
Email:  alex.christian@ipmvs.com
Email:  mvslit@ipmvs.com

Gregory T. Everts
State Bar No. 1001636
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
608-283-2460
Fax: 608-294-4911
Email:  gregory.everts@quarles.com

*ATTORNEYS FOR DEFENDANT IOWA HEALTH
SYSTEM d/b/a UNITYPOINT HEALTH*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2014, I filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the following:

> John C. Scheller
> Michelle L. Dama
> Albert Bianchi, Jr.
> MICHAEL BEST & FRIEDRICH LLP
> One South Pinckney Street, Suite 700
> Madison, WI 53703
> Email:  jcscheller@michaelbest.com
>         mldama@michaelbest.com
>         abianchi@michaelbest.com

/s/ _____

45