IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITY HEALTH PLANS INSURANCE
CORPORATION,

                Plaintiff,                      OPINION & ORDER

    v.                                        13-cv-845-wmc

IOWA HEALTH SYSTEM d/b/a
UNITYPOINT HEALTH,

                Defendant.

---

In this trademark infringement action, plaintiff Unity Health Plans Insurance Corporation ("Unity Health") seeks injunctive relief against defendant Iowa Health System, which began the process of rebranding itself in early March of 2013 as UnityPoint Health (generally identified in the remainder of this opinion by the name under which it now does business, "UnityPoint").  Even though both Unity Health and UnityPoint are in the health care market, the latter's name change was not an issue initially because the companies' geographic markets (Southwestern Wisconsin and Iowa/Illinois respectively) did not overlap.  This changed dramatically on January 1, 2014, when UnityPoint finalized its affiliation with Meriter Health Services ("Meriter") and instantly became a health care provider in the southwestern Wisconsin healthcare market, where Unity Health had already established a presence.  That affiliation proved the catalyst for this lawsuit, in which  Unity Health seeks to enjoin defendant's use of the UnityPoint name within Unity Health's principal marketplace, which consists of twenty counties located in southwestern Wisconsin.  Specifically, Unity Health alleges that UnityPoint has violated § 43(a) of the Lanham Act by infringing its claimed common law rights in the trademark "UNITY."

Currently before the court is Unity Health's motion for a preliminary injunction. (Dkt. #5.)  On January 27, 2014, the court held a hearing on that motion, which it will now grant in part and deny in part for the reasons set forth below.

## ALLEGATIONS OF FACT[1]

### I.  The Parties

Plaintiff Unity Health is a Wisconsin insurance corporation with its principal place of business in Sauk City, Wisconsin.  Unity Health is an "HMO insurer" as defined by Wis. Stat. § 600.03(23c), which requires it to offer an adequate health care provider network within a designated 20-county marketplace located in southwest Wisconsin (the "Unity Health Territory").[2]  In essence, this market comprises all of southern Wisconsin outside of the Greater Milwaukee area and surrounding counties as reflected by the shaded area of the following Wisconsin map.

---

[1] UnityPoint purports to dispute many of Unity Health's proposed findings of fact, but several of the disputes hinge not on contradictory evidence but instead on its own assertions that Unity Health's evidence, such as the declaration of Unity Health's President and CEO Terry Bolz, is insufficient to prove certain points.  These ostensible "disputes" do not comply with this court's procedures on motions for injunctive relief, which: (1) permit the moving party to rely upon affidavits for admissible factual propositions personally known to the affiant, and (2) require the responding party to cite with precision to the evidentiary matter or the testimony to be presented at the hearing that will refute the factual proposition.  Accordingly, the court deems many of those facts undisputed for purposes of plaintiff's preliminary injunction motion.

[2] These counties are Dane, Crawford, Grant, Iowa, Lafayette, Green, Rock, Walworth, Jefferson, Dodge, Columbia, Sauk, Richland, Vernon, Juneau, Adams, Waushara, Marquette, Green Lake and Fond du Lac.  (*See* Bolz Affidavit (dkt. #6) ¶ 36.)



Unity Health's insurance business depends on managing the continuity, quality and compliance of covered healthcare services within this geographic market.

Defendant Iowa Health Systems, doing business as UnityPoint Health, is an Iowa non-profit corporation with its principal place of business in Des Moines, Iowa.  Initially formed in 1994, UnityPoint provides similar health insurance coverage through integrated clinics, hospitals, home care and hospice care on a regional basis in Iowa, Illinois and now southwestern Wisconsin.

## II. Unity Health's History

Unity Health Insurance was formed in 1995 through the merger of two relatively small health care providers in the Southwest Wisconsin marketplace, U-Care and HMO of Wisconsin.  This merged entity first operated as "Unity Health Plans Insurance Corporation" and was owned by BlueCross BlueShield of Wisconsin.  In 2003, that entity

was acquired by WellPoint.  In 2005, it became a wholly-owned subsidiary of University Health Care, Inc. ("UHC") and an affiliate of the University of Wisconsin Hospitals and Clinics Authority ("UWHC") and the University of Wisconsin Medical Foundation ("UWMF").  In the Wisconsin marketplace, UHC, UWHC and UWMF are jointly known as "UW Health."

Unity Health has used three different logos since its formation.  Those logos are:



As a UHC subsidiary, one of Unity Health's strategic goals is to incent its member-insureds to use UW Health facilities and doctors by making UW Health its preferred health care provider, although Unity Health Insurance is also accepted by some providers other than UW Health.  For example, Unity Health has a contractual relationship with Meriter, placing some of Meriter's services like maternity services within Unity Health's preferred network.  Some UW Health doctors also have admission privileges at Meriter Hospital, which is one of three major regional hospital groups based in Madison, Wisconsin (along with UWHC and St. Mary's Hospital).

Over the past five years, Unity Health spent approximately 3.6 million dollars on marketing and advertising, including the use of radio, television, newspaper and internet. For example, it has advertised on WISC TV and WKOW TV, the Madison-based affiliates of CBS and ABS, respectively.  Consistent with the most recent of Unity Health's three logos above, Unity Health refers to its affiliation with UW Health on its website,

www.unityhealth.com, and in its promotional materials.  The website also provides a tool to search for medical providers, information regarding pharmaceuticals and access to the MyChart portal that serves Unity Health members and UW Health patients.

In 2006, Unity Health conducted market research to assess "[r]ecall/recognition of Unity Health and other competitive health plans," the "[a]wareness of Unity and other health plan advertising," and the "[r]ecall and believability of advertising content."  (*See* Bolz Decl. Exh. C (dkt. #6-3) 2.)  That study indicated that Unity Health was fourth in terms of name recognition for managed healthcare insurance providers.  The study also showed that the primary drivers of new state and commercial members to Unity Health's network are its pricing, its affiliation with UW Health and the physicians and hospitals in its preferred network.

### III. Iowa Health Systems' Adoption of the "UnityPoint" Name and its Entry into Wisconsin

On March 5, 2013, Iowa Health Systems carried out a "Fictitious Name Resolution," adopting the name "UnityPoint Health."  (*See* Bianchi Decl. Exh. B (dkt. #13-2).)  In April 2013, Iowa Health Systems first began doing business as "UnityPoint Health," which was chosen as most consistent with branding itself as one system, operating in multiple regions, and allowing for growth while marketing itself as patient-focused, in part through adoption of the tag line, "The point of unity is you."

In October 2013, UnityPoint and Meriter entered into an Affiliation Agreement. Pursuant to that Agreement, UnityPoint would become Meriter's sole corporate member and would acquire control of Meriter's subsidiary, Physicians Plus Insurance Corporation

("PPIC"), one of two prominent physician-centered HMOs in the region (the other being Dean Care, which is now affiliated with St. Mary's Hospital).  Meriter provides healthcare services to Dane County and the surrounding communities and competes with UW Health and St. Mary's health care patients.  Likewise, PPIC competes with Unity Health and Dean Care for institutional and individual purchasers of health care insurance.

Following the announcement of their agreement, Meriter sent a letter to its customers informing them of its affiliation with UnityPoint.  The letter also assured consumers that the new affiliation would not alter the services offered by Meriter or PPIC. The parties completed UnityPoint's acquisition of Meriter, effective January 1, 2014.

Other than the October 2013 press release and a press conference held in January 2014, UnityPoint has done nothing to date to advertise the link between Meriter and UnityPoint.  (Hr'g Tr. (dkt. #92) 39:13-15; 61:24-62:5.)  Additionally, UnityPoint has no specific plans to advertise the new affiliation as part of a rebranding process.  (*Id.* at 39:2-6.)

Still, the logos it plans to use for Meriter are:



This limited rebranding is inconsistent with UnityPoint's other hospitals, which features the UnityPoint mark most prominently, with the location of the hospital or clinic below.  Both UnityPoint's witnesses and its counsel also testified at the preliminary injunction hearing that it does not intend to change the PPIC name or mark.  (*See, e.g.*, Hr'g Tr. (dkt. #90) 142:10-12; Hr'g Tr. (dkt. #92) 23:12-14.)  As a result, PPIC will continue to be branded as:



## IV. OCI Proceedings

As part of its planned acquisition of Meriter, UnityPoint applied to the Wisconsin Commissioner of Insurance for approval of its plan for acquisition of control of Meriter's insurance arm, PPIC.  On December 6, 2013, Unity Health filed a Motion to Intervene and an Opposition in the Matter of the Acquisition of Control of Physicians Plus Insurance Corporation by Iowa Health Systems d/b/a UnityPoint Health.  Although UnityPoint did not intend to change the PPIC name, Unity Health objected to the affiliation, arguing that there would likely be joint marketing of PPIC and UnityPoint in Wisconsin.

OCI found that UnityPoint and PPIC "[did] not plan to change the name of PPIC or to require PPIC to use the UnityPoint Health trade name."  Accordingly, it denied Unity Health's motion to intervene on December 18, 2013.  Finding that any alleged confusion was purely speculative, OCI ultimately granted UnityPoint's application subject to three conditions:

> a) If PPIC uses the UnityPoint or UnityPoint Health tradename(s) and trademark(s) to reference its affiliation with UnityPoint Health in its marketing materials, PPIC will include a reasonable notice that PPIC is an affiliate of Iowa Health System, which does business as UnityPoint Health.

> b) If PPIC uses the UnityPoint or UnityPoint Health tradename(s) and trademark(s) to reference its providers in its marketing materials, PPIC will include a reasonable notice that (1) the provider is an affiliate of Iowa Health System, which does business as UnityPoint Health, or (2) UnityPoint Health is not an affiliate of Unity Health Plans Insurance corporation.

7

> c) Nothing in these conditions subsequent will preclude OCI from ordering further remedies to cure any potential customer confusion.

(*See* Def.'s Opp. to Expedited Hr'g Exh. B (dkt. #20-2) 3-4.)   Unity Health has appealed that decision.

## V.  Evidence of Confusion

The parties dispute whether any actual confusion has thus far arisen from the announced merger of Meriter and UnityPoint.  With its initial motion for a preliminary injunction, Unity Health submitted as evidence six telephone call recordings between Unity Health members and customer service representatives.  Unity Health argues that these calls demonstrate actual consumer confusion even though the Meriter-UnityPoint affiliation is still very new and has not yet been actively marketed.

In some of those calls, Unity Health members inquire as to whether Meriter's merger will affect their Unity Health coverage of certain Meriter services.  (*See, e.g.*, Wiegert Supp. Decl. Exh. B (dkt. #36-2) ("I know that Meriter sent us a letter recently about merging with, I apologize, I don't recall who at this moment, but I just wanted to know is that going to affect, you know, our coverage at Meriter at all. . . ?"); *id.* at Exh. D (dkt. #36-4) ("There's been several articles in the paper about Meriter Hospital and UnityPoint.  Does that affect – Meriter is where I would normally, if I had to go to the hospital, that's where I would go. Does that affect that?").)

In other calls, Unity Health members inquire as to whether Unity Health and Meriter are discussing the possibility of a merger, suggesting that those members are at least somewhat confused.  (*See, e.g.*, Wiegert 2d Supp. Decl. Exh. E (dkt. #38-1) ("Question for

you. I heard in a press release that that, uh, Meriter and Unity are talking.  Is that true?");

*id.* at Exh. F (dkt. #38-2) ("The other thing, I had seen advertised recently, there was some merger between, uh, Physician's Plus and Unity, I'm not sure if it was Unity Health Insurance or not.").)

The remaining two calls come from Unity Health members who have acted on their own confusion:  one of whom apparently read the press release and purchased health insurance through Unity Health because she believed Unity Health would be covering Meriter services (*see* Wiegert Supp. Decl. Exh. A (dkt. #36-1)); the other of whom went to a UnityPoint urgent care clinic in Iowa because she assumed it would be covered by her Unity Health insurance (*see id.* at Exh. C (dkt. #36-3) ("I've never heard of such a thing! Why would they use the name Unity if they're not part of Unity Insurance?").

During the hearing, Unity Health offered additional evidence of confusion acquired through discovery of internal documents to UnityPoint, which suggest that Meriter and UnityPoint themselves have recognized the potential for at least some confusion.  (*See* Pl.'s Exh. 063, at UPH00005042 (Meriter meeting minutes stating council members have heard questions including "will 'Unity' take my insurance now?" and "Is 'Unity' taking Meriter over?"); Pl.'s Exh. 279, at UPH00004449 (UnityPoint question-and-answer document stating "Yes there will most likely be some confusion between UnityPoint (Iowa) and Unity Health Insurance."); Pl.'s Exh. 280, at UPH00004995 (UnityPoint question-and-answer document stating "Jim noted a trademark search is in process and there may be some confusion at first but is not too concerned").)

Finally, Meriter itself has apparently received between 10 and 15 inquiries or questions that mentioned "Unity." (*See* Pl.'s Exh. 250 at 11.) The details of those calls are not known, however, because Meriter did not record them.

OPINION

To obtain preliminary injunctive relief, a plaintiff must demonstrate as a threshold matter: (1) some likelihood of success on the merits of its trademark infringement claim; and (2) the lack of an adequate remedy at law, coupled with irreparable harm if the injunction is denied. *Wolf Appliance, Inc. v. Viking Range Corp.*, 686 F. Supp. 2d 878, 886 (W.D. Wis. 2010). If the plaintiff meets these first two requirements, it must then show: (3) the harm it would suffer if denied an injunction would outweigh the harm the defendant would suffer if the injunction issues; and (4) the issuance of an injunction would not negatively affect the public interest (i.e., non-parties). *Id.* As both sides acknowledge, the Seventh Circuit has often stated that this analysis involves a sliding scale, so that "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). This approach "is not mathematical in nature[;] rather[,] 'it is more properly characterized as subjective and intuitive, one which permits district courts to weight the competing considerations and mold appropriate relief.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

**I.  Likelihood of Success on the Merits**

To meet the first hurdle for entry of a preliminary injunction, Unity Health must at least show that it has "a 'better than negligible' chance of succeeding on the merits." *Ty,*

*Inc.*, 237 F.3d at 897; *see also Platinum Home Mortgage Corp. v. Platinum Financial Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).  "This is an admittedly low requirement and is simply a threshold question."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008).  Only after this hurdle is cleared need the court determine how likely Unity Health's success must be to issue an injunction.  *Id.*

Accordingly, the court looks first at Unity Health's substantive trademark infringement claim under § 43(a) of the Lanham Act.  To prevail in an action under § 43(a), Unity Health must establish that: (a) it has a protectable trademark; and (b) there is a likelihood of confusion as to the origin or affiliation of UnityPoint's services.  *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988).  UnityPoint contests both of these elements, arguing that: (a) Unity Health has not demonstrated that it has protectable trademark rights in the UNITY mark; and (b) Unity Health has failed to establish a likelihood of confusion.  The court considers each of these requirements in turn, keeping in mind that at this stage of the analysis, it must consider "not whether the plaintiff will or will not prevail on the merits, but whether the plaintiff has demonstrated a better than negligible chance of establishing the 'trademark' and 'likelihood of confusion' prongs under section 43(a)."  *Id.*  However minimally, the court finds Unity Health has met this threshold question for the reasons set forth below.

### A.  Protectable Trademark

Although Unity Health has not registered its mark, the Lanham Act "protects unregistered (common law) trademarks as well as federally registered trademarks."  *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986).  "The validity of a

mark pertains to whether a 'word, term, name, symbol or device,' 15 U.S.C. § 1125(a)(1), is entitled to protection under trademark law by focusing on whether that mark specifically identifies and distinguishes one company's goods or services from those of its competitors." *Platinum Home Mortgage Corp.*, 149 F.3d at 726.  When the mark at issue is not registered with the United States Patent and Trademark Office, "the burden is on the claimant" to establish that it is entitled to protection.  *Id.* at 727 (citing *Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996)).

Marks are classified into five categories of increasing distinctiveness:  (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful.  *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992)).  Generic marks are commonly used, do not identify a particular source and are entitled to no trademark protection.  *Id.*  Descriptive marks are those that describe "the ingredients, qualities, or characteristics of an article of trade or a service."  *Id.* (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)).  They do not generally receive trademark protection, but may if they acquire secondary meaning "in the collective consciousness of the relevant community."  *Id.* (quoting *Mil-Mar Shoe Co.*, 75 F.3d at 1157).  Finally, suggestive, arbitrary or fanciful marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."  *Two Pesos*, 505 U.S. at 768.

Unity Health argues that its mark is arbitrary, but this is a bridge too far.  An arbitrary mark is one "applied to a service unrelated to its meaning."  *Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir. 2004).  While the word "unity" by itself has no immediate relationship to health care, "it is not necessary that a descriptive term depict the [product] itself, but only that the term refer to a *characteristic* of the [product]."  *Sands, Taylor & Wood*

*Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992) (quoting *Forum Corp. v. Forum, Ltd.*, 903 F.2d 434, 438 (7th Cir. 1990)).  Here, the word "unity" unquestionably describes the *characteristics* of the service Unity Health offers.  Indeed, the branding history of both parties indicate that the word "unity" was *chosen* to convey characteristics of "unified" health services available across hospital and physician groups.  Unity Health itself emphasizes that its insurance business is an "integrated managed health care business" and that its insurance services are integrated with its delivery of health services, "unifying" all aspects of health care through the services it offers.  (*See* PPFOF (dkt. #12) ¶¶ 9-11.)  Based on Unity Health's own characterization of the services it offers, the claimed mark "UNITY" is plainly not arbitrary; it is either descriptive or suggestive.

The line between descriptive and suggestive marks is admittedly a thin one.  The Seventh Circuit has articulated a test known as the "degree of imagination test" to identify the difference:

> [I]f a mark imparts information directly it is descriptive.  If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.

*Sands, Taylor & Wood Co.*, 978 F.2d at 952.  In applying this test, the Seventh Circuit has upheld a district court's finding that the trade name "Platinum Mortgage" was merely descriptive, because it "describe[d] the quality of plaintiff's mortgage services." *Platinum Home Mortgage Corp.*, 149 F.3d at 728.

Here, the question is even closer.  Nevertheless, the court agrees with UnityPoint that the trade name "UNITY" is likely to be found merely descriptive.  As in *Platinum Home Mortgage*, "'the mental leap . . . is nearly instantaneous' and . . . requires little imagination." *Id.* (quoting *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, No 97 C 5293, 1997

WL 567909, at *3-4 (N.D. Ill. Sept. 4, 1997)).   Unity Health's own explicit focus on integrating and "bringing together" all aspects of health services strengthens the conclusion that its chosen mark is descriptive of the characteristics of its services.   (*See, e.g.*, Christian Decl. Exh. 44 (dkt. #64-13) 5 (choosing name "Unity" because it meant, among other things, "[a]ll inclusive," "comprehensive," "[u]nified approach," and "connected employers, employees, physicians and hospitals").)

Defendants also point to various other parties in the health care industry who use the same or similar marks, including "UnitedHealthCare," "Unity Hospice," Unity Clinic" and "Unity Family Health and Services."   This also supports a finding that the "Unity" mark is merely descriptive (and therefore not inherently distinctive), since the mark itself "does not identify *one particular source* or designate the specific origin of [the] services without proof of secondary meaning."   *Id.* (emphasis added).

Because descriptive marks are not inherently distinctive, Unity Health must show that its mark has acquired secondary meaning.   "Secondary meaning arises when a mark 'has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark.'"   *Wolf Appliance, Inc.*, 686 F. Supp. 2d at 887 (quoting *Packman*, 267 F.3d at 641).   In determining whether a mark has acquired secondary meaning, the Seventh Circuit considers seven factors: (a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of

intentional copying.  *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).[3]

Defendants principally argue that Unity Health has not acquired rights in the term "UNITY" standing alone, because its logo has always included additional words -- such as "Health Plans," "Health Insurance" and, most recently, "Affiliated with UW Health."  As plaintiff points out, however, the Seventh Circuit "adheres to the rule that 'if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements.'"  *Ty, Inc.*, 237 F.3d at 898 (quoting *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)).  In other words, when a portion of a mark is particularly "well-known and famous," it is appropriate to give that portion more weight in the analysis.  *Id.* at 899.  At the hearing, Unity Health presented evidence demonstrating that its advertising has frequently employed the word "Unity" standing alone.  (*See, e.g.*, Pl.'s Exh. 141 (1999 "Unity News" newsletter); Pl.'s Exh. 181 (2012-13 print ad; "Think healthy.  Think Unity."); Pl.'s Exh. 182 ("Sickness happens.  Get Unity.").)  Moreover, Unity Health's logos have always placed the greatest emphasis on the word "Unity," and even more specifically on the letter "U," a happy marriage of logos after being acquired by UW Health.

---

[3] Without citation, Unity Health asserted during the hearing that secondary meaning is presumed upon five years of use.  The court has found no support for that proposition.  15 U.S.C. § 1052(f) allows an applicant to use "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made" as prima facie evidence of distinctiveness, but it appears that that section is applicable only in attempting to place a trademark on the principal register.



Accordingly, even if Unity Health's mark is in fact "Unity Health" or "Unity Health Insurance," the "Unity" portion is salient and has reduced the importance of the other elements, at least within Unity Health's primary marketplace of southwest Wisconsin.[4]

Other factors also support a finding that Unity Health has a protectable mark. Unity Health has used the "UNITY" portion of its mark continuously since 1995. Unity Health also has increased its market share in the Group Accident and Health Market in Wisconsin from 2.9% in 2002 to 4.8% in 2012 -- admittedly still relatively small, but supporting Unity Health's claim of having an established place in the southwestern Wisconsin market. Similarly, Unity Health's membership has increased from about 91,000 in 2009 to about 150,000 as of November 2013. Unity Health also avers to spending over $3,000,000 in the last five years advertising "under the UNITY trademark," which gives some weight to Unity Health's argument that it has acquired secondary meaning in that mark. Thus, Unity Health has established a better-than-negligible chance that it will be able to prove protectable common law trademark rights in the "UNITY" mark within southwestern Wisconsin, which leads the court to proceed to the next step of the analysis.

---

[4] Whether "Unity" is *the* salient portion of the mark is certainly open to debate even within this market, something that will likely require a well-conceived and executed market study to begin to resolve, but Unity Health has at least offered enough proof to find more than a negligible chance of prevailing on this argument.

### B. Likelihood of Confusion

The second element of the infringement claim requires Unity Health to demonstrate that it has a better-than-negligible chance of demonstrating likelihood of confusion.  The test for likelihood of confusion requires the court to consider seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm off his product as that of another."  *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-44 (7th Cir. 2000) (internal quotation marks omitted).  No single factor is dispositive, and the court may assign varying weights to each factor based on the particular case.  *Id.* at 1044.  Three of the factors are particularly important, however: the similarity of the marks, the defendant's intent, and actual confusion.  *Id.* (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)).  Here again, Unity Health has offered sufficient evidence to establish some chance of prevailing within its narrow marketplace of southwestern Wisconsin.[5]

### i.    Similarity of the Marks

To determine whether marks are similar, they must be "compared in light of what occurs in the marketplace."  *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976).  To further this analysis, a court may examine marks for "similarity of

---

[5] Neither side disputes that southwestern Wisconsin constitutes a distinct market for health care services.  For reasons alluded to in the fact section above, the tendency of consumers to shop locally for health services, if not health insurance, and obvious barriers to entry (at least in the short term), the existence of such a distinct market also seems reasonable enough.  In any event, the court will assume such a market for purposes of deciding Unity Health's motion for preliminary injunction.

'sound, sight and meaning.'" *Henri's Food Prods.*, 727 F.2d at 355 (quoting *Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 638 (9th Cir. 1963)).  "Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Packman*, 267 F.3d at 644 (7th Cir. 2001).  As noted above, if one word or feature of a composite trademark is the salient portion of the mark, it may be given more weight than the surrounding elements.  *Int'l Kennel Club,* 846 F.2d at 1087-88 (quoting *Henri's Food Prods.*, 717 F.2d at 356).  Nevertheless, an inquiry into similarity will look at the entirety of the marks, not just one specific component.  *AutoZone, Inc. v. Strick,* 543 F.3d 923, 929 (7th Cir. 2008).

In many respects, the marks appear to be dissimilar.  Certainly from a consumer's perspective, Unity Health's logo features the word "Unity" in "Badger red" as its focal point, with a large "U" styled to evoke the University of Wisconsin:



In contrast, UnityPoint represents that the marks it will actually use in southwestern Wisconsin feature the well-known blue "Meriter" mark as their focal point, with a blue Greek cross and "UnityPoint Health" (or some variant thereof) below:



18

The "UnityPoint" portion of the mark contains letters of the same size, is colored black and is in a different font than the "Unity" of Unity Health's mark.  The only real similarity between these two *logos*, then, is that both include the word "unity."

Moreover, the PPIC logo, which UnityPoint represents it will not change, bears *no* similarity to the Unity Health logo: it features the words "Physicians Plus" in blue along with a mark that combines a cross with the letter "P":



Certainly, this is of significance, particularly because PPIC, not UnityPoint, is Unity Health's direct competitor, and UnityPoint has represented that it will not advertise the affiliation between PPIC and UnityPoint.  This is not just a representation by UnityPoint, as with its planned use of the Meriter dominant mark with UnityPoint, but in part a binding order of the OIC unless overturned on appeal.[6]

Although these logos are dissimilar, Unity Health rightly points out that the court's analysis does not end there.  The court must consider the marks themselves with attention to how they will be encountered in the marketplace.  While the parties both advertise in print publications, consumers also encounter the marks through television and radio advertising, when the visual dissimilarities between their logos will be of little or no consequence.  *See Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115-16 (7th Cir. 1997) (in reaching a finding of no similarity, the district court erred by only comparing logos without considering the fact that the mark was likely to be encountered

---

[6] The OIC order allows some reference of PPIC's affiliation with UnityPoint, but only with reference to Iowa Health or express disavowal of any affiliation with Unity Health.

aurally).   Additionally, UnityPoint's Director of Communications and Public Relations, Laura Sinnard, conceded that UnityPoint's advertising regularly uses the tagline "The point of unity is you."  (Hr'g Tr. (dkt. #92) 59:11-16.)  This rearrangement of the elements of its "UnityPoint" mark has the potential to prove extremely confusing, particularly in light of Unity Health's print and radio advertising urging consumers to "choose Unity," "think Unity" or "get Unity."

Thus, while the parties' logos are not visually similar, the likelihood of confusion over the *marks* is a much closer question.  Accordingly, the court concludes that as consumers will encounter them in the marketplace, the similarities between "Unity" and "UnityPoint" create some potential for confusion that is not entirely mitigated by the difference in logos, at least as UnityPoint first enters the southwestern Wisconsin market for health care services.

ii.     **Similarity of the Products**

Trademark law "prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's."  *Sands, Taylor & Wood Co.*, 978 F.2d at 958.  "A 'closely related' product is one 'which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."  *Id.* (quoting 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 24:3, at 166).

UnityPoint admits in its briefing that the medical services it offers fall under the same "umbrella of healthcare services" as Unity Health's insurance services and its affiliated

health care providers.  The court agrees.  Particularly in this market, health insurers frequently affiliate with particular care providers (as Unity Health has with UW Hospital, Dean Care has with St. Mary's and PPIC has with Meriter).  Moreover, there is at least some evidence that a portion of the buying public could reasonably believe that "UnityPoint Health" services are linked to "Unity Health Insurance," or that a "UnityPoint Clinic" is linked to "Unity Health Insurance" as its affiliated insurer.  *Cf. Int'l Kennel Club*, 846 F.2d at 1088 ("[E]ven if fanciers of purebred dogs or stuffed toys attached any meaning to the defendants' ["24K Polar Puff"] house mark, they would necessarily believe that the International Kennel Club had licensed, approved or otherwise authorized the defendants' use of the International Kennel Club name.").  Thus, UnityPoint's assertion that this factor either favor[s] UnityPoint Health or [is] effectively neutral to the analysis" rings hollow. (Def.'s Br. (dkt. #43) 41.)

UnityPoint's only argument to the contrary is that Unity Health's mark is so weak that the public will easily distinguish differences between the marks even though the goods are closely related.  At most, this argument affects the amount of *weight* this court gives to this factor in light of the strength of the mark (discussed below); it does not change the fact that the products offered by the two companies are similar.  Accordingly, this factor weighs in favor of Unity Health.

### iii.  Area and Manner of Concurrent Use

As it must, UnityPoint admits in its briefing that the parties will be offering services in the same geographic area; indeed, UnityPoint deliberately acquired the locally-prominent Meriter hospital and clinics, as well as its wholly-owned Physicians Plus HMO, in order to

expand into the market for health care services in southwestern Wisconsin.  The court, therefore, flatly disagrees with UnityPoint that this factor "either favor[s] UnityPoint Health or [is] effectively neutral to the analysis."  (Def.'s Br. (dkt. #43) 41.)  While certainly this factor alone is not dispositive, it weighs heavily in favor of Unity Health.

### iv.    Consumers' Degree of Care

Next, the court considers the degree of care consumers will exercise in purchasing the products or services at issue.  "[T]he lower the degree of ordinary care, the greater likelihood of confusion, and vice versa."  Richard L. Kirkpatrick, *Likelihood of Confusion in Trademark Law*, § 6:2, at 6-4.  In considering this factor, the court "must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (internal quotation marks omitted).  "The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases."  *CAE, Inc.*, 267 F.3d at 683.  In contrast, consumers are generally held to exercise greater care when making more expensive purchases.  *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985); *see, e.g.*, *Wolf Appliance, Inc.*, 686 F. Supp. 2d at 891 (noting that high-end ranges "are relatively expensive" and that "[a] consumer who is investing $2,000-$12,000 on a range is unlikely to buy a range without being sure of the brand").

Price is not the only factor relevant to determine consumers' degree of care, or even necessarily determinative on its own.  *See Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1230 (7th Cir. 1993) ("Neither Nike nor the district court has cited any case where a customer's

degree of care depends solely on price."). Certain consumer decisions may carry with them a greater standard of care based on the nature of the purchase. *See* Kirkpatrick, *Likelihood of Confusion in Trademark Law,* § 6:5, at 6-12 – 6-14 (listing circumstances courts have held to increase the degree of care such as "consultation with experts," "institutional purchasing practices," and "solicitation and comparison of proposals"); *see also Wash. Nat'l Ins. Co. v. Blue Cross & Blue Shield United of Wis.,* 727 F. Supp. 472, 475 (N.D. Ill. 1990)).

Taken as a whole, this factor weighs heavily in UnityPoint's favor. First, the evidence, as well as common sense, dictates a finding that consumers approach health care decisions with a high degree of care, including anecdotal evidence offered by Unity Health itself in the form of customers initiating calls to find out how their health insurance coverage might be affected by the proposed merger between Meriter and UnityPoint. (*See* Wiegert Supp. Decl. Exhs. B, D (dkt. ##36-2, 36-4).) Health insurance is also a costly service, and given the rising costs of health care services, it is likely among the most costly purchases to an average consumer. Even if this were not so, choosing a health insurer is a decision of significant gravity, particularly as it can affect virtually all of a consumer's health care options going forward. This, too, is a growing concern to consumers as health services and health insurance decisions increasingly overlap, particularly in an area like southwestern Wisconsin, where HMOs play a significant part, if not the dominant part, in the market for health insurance.

Certainly, Unity Health is right to point out that the intertwined nature of health insurance and providers in the market for medical services in southern Wisconsin has made it more difficult to navigate the system. As confirmed by anecdotal evidence, this may prove more of a short-term issue than a long-term issue, as consumers sort out their choices

and particularly as larger, sophisticated state and commercial entities come up for annual renewal of the health care options they wish to offer their employees. And contrary to Unity Health's assertion, the complications of the Affordable Care Act are more likely to *heighten* even individual consumers' degree of care, as they are required to navigate an unfamiliar system to make an expensive purchase that may impact their family's health.

Unity Health argues that even if consumers exercise a high degree of care, that does not foreclose the possibility of "initial interest confusion." Initial interest confusion "occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek*, 300 F.3d at 812. For purposes of initial interest confusion, "[w]hat is important is not the duration of the confusion, it is the misappropriation of . . . goodwill." *Id.* at 812-13.

For example, this court considered the possibility of initial interest confusion in *Wolf Appliances*. In that case, the plaintiff, Wolf Appliance, had trademarked the use of red knobs on ranges and sued Viking Range Corporation for offering ranges with similar red knobs. Though the court found that consumers were likely to use a high level of care in making such an expensive purchase, there were "scenarios in which confusion [was] likely":

> Suppose a potential range customer is at a dinner party and the hostess tells the potential customer how much the hostess enjoys her range. The range happens to be a Wolf range with red knobs. Several weeks or months later, when the potential customer enters a retail store to browse ranges, he or she sees a stainless steel Viking range displayed with red knobs that looks similar to the red-knob range he or she has seen in the past. There are no other ranges displayed with red knobs. The customer does not remember the brand of the hostess' range, but the customer knows that Viking is a well-known manufacturer in the high-end range market. The red knobs look familiar, so the customer thinks this is the range to which the hostess spoke so highly. . . . Such a situation could qualify as

24

> "initial interest" confusion, because defendant would be reaping the benefit of the goodwill that plaintiff has developed in its mark.

*Wolf Appliance, Inc.*, 686 F. Supp. 2d at 891-92; *see also Promatek*, 300 F.3d at 812-13 (placing "Copitrack" metatag in Equitrac website would direct consumers to competitor website, where they would likely "learn more about Equitrac and its products before beginning a new search for Promatek and Copitrak").

The court is not persuaded that this case presents a comparable situation to *Wolf*.  If a person mentions to a potential health insurance consumer that she has had a good experience with her HMO insurer, "Unity," when the potential consumer enters the market, that consumer will be faced with a choice between Unity Health Insurance and Physicians Plus, not a choice between Unity Health and UnityPoint.  Though the products are similar enough that a person may believe Unity Health and UnityPoint clinics are linked in some way, the two are not direct competitors.  Moreover, it seems even more unlikely, as Unity Health argued during the preliminary injunction hearing, that on the basis of Unity Health's goodwill alone, a customer will enter into an insurance plan through PPIC because he knows that PPIC is affiliated with Meriter, which is in turn affiliated with "UnityPoint." (*See, e.g.*, Hr'g Tr. (dkt. #90) 36:17-38:4.)

Unity Health also argues that Unity Health customers will be drawn to Meriter because of the use of "UnityPoint" in its new mark, on the assumption that Unity Health will cover Meriter services.  Indeed, an anecdote offered by Unity Health supports that possibility (though misinformation from a third party also appeared to play a role in the confusion).  (*See* Wiegert Supp. Decl. Exh. C (dkt. #36-3).)  Still, the court is not convinced that this should carry great weight in light of the amount of care that consumers generally

25

exercise in making health care decisions and given that at least some consumers choose their health care providers *first*, and then select an insurer who covers those providers.  (*See, e.g., id.* at Exh. A (dkt. #36-1) (Unity Health customer signed up for Unity Health insurance services because she wanted to use Meriter and believed Meriter would be covered).)[7] Accordingly, the court concludes that the consumer care factor weighs in UnityPoint's favor.

### v.    Strength of the Mark

"The 'strength' of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE, Inc.*, 267 F.3d at 684.  Marks that are widely recognized merit greater protection from the courts.  *See, e.g., Nike, Inc.*, 6 F.3d at 1231.  In assessing mark strength, the court must first determine to which category the mark belongs.  *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1170 (7th Cir. 1986).  As noted above, the court has found that "UNITY" in this context is likely a descriptive mark, which is on the weak end of the trademark scale: such marks are not inherently distinctive and require a showing of secondary meaning.  Additionally, the fact that numerous other entities in the health care industry use the word "Unity" in their name or a closely-related variant like "United" or "Unified," supports the notion that "Unity," on the whole, is a relatively weak indicator of

---

[7] This is not to reject the real possibility, particularly in the near term, that new Meriter advertising and signage touting its affiliation with UnityPoint may not engender confusion and even expectations of insurance coverage by Unity Health for services offered by Meriter. But *both* sides have a strong incentive to avoid the loss of goodwill that might be engendered if these expectations are not addressed.  Moreover, as anyone knows who attempts to obtain health care at a hospital or clinic, insurance coverage is among the first items addressed except in true emergencies.  Still, if the failure to fulfill the reasonable expectations of its insureds proves to be a problem for Unity Health consumers, the court would not be adverse to a motion seeking to amend its preliminary injunction to require Meriter to discontinue all use of Unity and/or to provide services free of charge.

the source of services.  *See CAE, Inc.*, 267 F.3d 685 (noting that evidence of third-party use can weaken a party's mark); *see also, e.g.,* UNITEDHEALTHCARE, Registration No. 1967622.

Nevertheless, as previously discussed, there is at least some evidence that Unity Health has developed secondary meaning in the relatively limited area of southwestern Wisconsin.  Moreover, testimony at the hearing indicated that there are no competing uses of the "UNITY" mark in the Unity Health Territory, except at its borders.  (Hr'g Tr. (dkt. #90) 23:13-24.)   As noted, Unity Health has also seen its market share and customer membership numbers rise significantly in recent years, no doubt in part due to advertising that links its services both to the "Unity Health Insurance" mark and to "UNITY" alone.  At least in southwestern Wisconsin, the "UNITY" mark is, if not strong, not so weak as to completely discount it.  Overall, this factor is effectively neutral to the analysis.

### vi.   Actual Confusion

"There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion."  *Int'l Kennel Club*, 846 F.2d at 1089 (quoting *World Carpets, Inc. v. Dick Littrells New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)).  If available, this evidence is "entitled to substantial weight" in the overall analysis.  *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001).  Nevertheless, "the plaintiff need not show actual confusion in order to establish *likelihood* of confusion."  *Sands, Taylor & Wood Co.*, 978 F.2d at 960 (emphasis in original).  Nor does a plaintiff need to produce consumer survey evidence at the preliminary injunction stage.  *Int'l Kennel Club*, 846 F.2d at 1086.

"One instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion." *CAE, Inc.*, 267 F.3d at 686.  The Seventh Circuit has upheld a finding of consumer confusion based on "letters, phone calls, and inquiries received by the plaintiff." *Int'l Kennel Club*, 846 F.2d at 1090.  On the other hand, instances of confusion that are not attributable to the applicable consumer group are entitled to less weight.  *See, e.g., Packman v. Chi. Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (friends and family who did not intend to purchase goods were not relevant consumers under the Lanham Act); *CAE, Inc.*, 267 F.3d at 686 (testimony absent identity of speaker and timeframe not entitled to much weight, "particularly because the speaker was not a customer of CAE, Inc. but rather a supplier").  De minimis evidence of confusion may also be discounted.  *See, e.g., Packman*, 267 F.3d at 645 (holding that district court properly discounted four calls as de minimis); *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993) ("vague hearsay account of what may have been actual confusion" was properly discounted).

Unity Health relies primarily on its own recordings of six recent customer phone calls to demonstrate actual confusion.  At least two of these calls, the court discounts entirely: Exhibits B and D feature not callers who have conflated Unity Health with UnityPoint, but instead who have heard that Meriter is merging with an outside company and want to know if that will affect their Unity Health insurance coverage of Meriter services.  (*See* Wiegert Decl. Exhs. B, D (dkt. ## 36-2, 36-4).)  The other four calls are somewhat more persuasive.  Those calls came from members of the relevant consumer group and indicate some confusion as to whether Unity Health and UnityPoint are the same entity (in the case of calls A, E and F) or whether Unity Health and UnityPoint are affiliated in some way (in the

case of call C).   UnityPoint urges the court to dismiss these calls as de minimis, but the court is not inclined to do so at the preliminary injunction stage -- particularly where these examples of confusion occurred even *before* UnityPoint has actively marketed the Meriter-UnityPoint affiliation.

Even if this anecdotal evidence from Unity Health were insufficient, Meriter itself has apparently taken between 10 and 15 calls from its own customers that mention "Unity."   While this evidence is less significant, particularly since the details of those calls are unknown, it nevertheless reinforces the notion that *some* confusion has already occurred at this very early stage, and that more confusion is likely to result -- at least in the short term -- once active marketing of the new affiliation begins.[8]

### vii.   UnityPoint's Intent

"A finding of fraudulent intent or bad faith is not essential to prove infringement where likelihood of confusion already exists."  *Henri's Food Prods. Co., Inc. v. Kraft Inc.*, 717 F.2d 352, 359 (7th Cir. 1983).   The court can infer likelihood of confusion, however, "when there is proof of intentional copying because then 'the adoption itself indicates that defendants expected that likelihood to their profit.'"   *Id.* (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir. 1965)).   "[I]f the infringer thinks [consumers] will be confused that is some evidence they will be."   *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986).   Mere *knowledge* of the senior user's

---

[8]Unity Health also points to evidence of concern about (and some evidence of actual confusion) on the part of Meriter UnityPoint employees.   As noted above, instances of confusion not attributable to the relevant consumer group are entitled to less weight in the analysis, *Packman*, 267 F.3d at 645, but evidence of confusion, or even concerns about confusion by UnityPoint and its new Wisconsin affiliate certainly lends weight to Unity Health's argument that confusion is likely.

mark, however, is not enough to show intent on the part of the alleged infringer. *See Barbecue Marx*, 235 F.3d at 1046.

In its briefing, Unity Health conceded there is no evidence that UnityPoint intended to palm off its services as those of Unity Health. At the hearing, there was further testimony not only that UnityPoint had no intention of capitalizing on Unity Health's goodwill, but also that Meriter did not come onto UnityPoint's radar as a possible affiliate until February of 2013 -- almost a year after UnityPoint had filed applications for the UNITYPOINT, UNITYPOINT CLINICS and UNITYPOINT HEALTH marks. *See* U.S. Trademark Application Serial No. 85614800 (filed May 2, 2012); U.S. Trademark Application Serial No. 85614825 (filed May 2, 2012); U.S. Trademark Application Serial No. 85614842 (filed May 2, 2012).[9]

## C. Overview

After considering all of the above factors, the court concludes that Unity Health has established a better-than-negligible chance of success on demonstrating a likelihood of consumer confusion between its mark and UnityPoint within Unity Health Territory. The marks have definite similarities when considered in terms of how they will be encountered in the marketplace, and the area of use and the similarity of products at issue are also factors that weigh strongly in Unity Health's favor. There is also some evidence of actual

---

[9] Unity Health suggests that there is some evidence of UnityPoint's "indifference" to Unity Health's trademark rights, but the court disagrees. On the contrary, it appears that UnityPoint has worked to mitigate the potential for confusion by altering its branding to place the focus of its newly acquired marks, "Meriter" and "Physicians Plus," rather than on "UnityPoint," even though doing so is inconsistent with its branding of other regional hospitals UnityPoint has acquired. Thus, the court finds no evidence of bad faith in UnityPoint's adoption of the "UnityPoint" mark and brand.

confusion even at this early stage in the UnityPoint-Meriter affiliation.  While the court also found that consumers will generally exercise a reasonable degree of care in acquiring health insurance and health care services, this evidence establishes at least some likelihood of confusion.  The court finds further support for this view in OCI's decision that UnityPoint must take affirmative steps to avoid consumer confusion between Unity Health and PPIC.

## II.  Lack of Adequate Remedy and Irreparable Harm

Unity Health argues that UnityPoint's use of the UNITY mark will damage consumer goodwill, as well as that this damage constitutes irreparable harm for which it lacks a remedy at law.  "[I]t is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002).  Likewise, the difficulty in assessing the damages associated with a loss of goodwill supports finding that the plaintiff lacked an adequate remedy at law.  *Id.*; *see also Ty, Inc.*, 237 F.3d at 902 (noting that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by [trademark] violations") (quoting *Abbott Labs.*, 971 F.2d at 16); *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997) (noting that injury to goodwill "can constitute irreparable harm for which a plaintiff has no adequate remedy at law").

Because the court has found that Unity Health has demonstrated a better-than-negligible chance of success on its underlying Lanham Act claim, Unity Health likewise enjoys a presumption of a lack of remedy at law and irreparable harm for preliminary injunction purposes.  UnityPoint's only argument against a finding of irreparable harm is

that it is impossible to make such a finding where there is no probative evidence of likelihood of confusion. *See, e.g.*, *Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F. Supp. 2d 1207, 1218 (S.D. Iowa 2000) ("Microware at least has to demonstrate a likelihood of confusion before it can conclude it has suffered irreparable harm.") (citation omitted). As already noted, however, the court found there *is* evidence of likelihood of confusion, and so this argument fails.


### III. The Balance of Hardships and the Public Interest

Finally, the court proceeds to the balancing phase of the preliminary injunction analysis, which "in an attempt to minimize the cost of potential error, must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086 (internal citation and quotation marks omitted). Unity Health rightly emphasizes that UnityPoint has neither begun actively marketing its new affiliation with Meriter, nor established a presence in southwestern Wisconsin. In fact, Sinnard testified that: UnityPoint and Meriter have spent no money on marketing under the new brand in Wisconsin (Hr'g Tr. (dkt. #92) 61:24-62:5); there has been no affirmative branding in Wisconsin (*id.*); and UnityPoint has "not yet" developed a reputation in the Wisconsin market. (*Id.* at 62:19-25; Sinnard Dep. (dkt. #79) 53:9-12.) To enjoin UnityPoint from use of its new brand and marks containing "Unity" in its name in southwestern Wisconsin would maintain the status quo, a point Meriter's President and CEO conceded at his January 24, 2014, deposition and at the hearing this week. (*See* Woodward Dep. (dkt. #83) 71:2-11.)

In response, UnityPoint posits three possible harms that will result from the entry of a preliminary injunction.   First, it argues that an injunction will frustrate the purpose behind UnityPoint's acquisition of Meriter and PPIC, which is to establish and grow them as part of a single, more substantial health care system providing consistent care across regions through rebranding and marketing itself in the Wisconsin market.   The court recognizes that preliminarily enjoining use of the UnityPoint name would, in fact, necessitate a variation in its preferred branding and advertising strategy, but the impact from this seems minimal given that (1) *no* rebranding has yet taken place in Wisconsin, and (2) as Sinnard testified, UnityPoint's advertising varies from region to region and will do so in Wisconsin in any event.   (Hr'g Tr. (dkt. #92) 63:12 ("We change our ads in every region currently.").)   In fact, UnityPoint has already voluntarily altered its branding in Wisconsin by arranging its proposed logos to emphasize the "Meriter" portion of the name, whereas the logos of its other hospitals use "UnityPoint" in the dominant position.  (*Id.* at 63:1-9.) Additionally, as Woodward testified, there are no current plans to spend the money necessary to rebrand Meriter.  (*Id.* at 47:1-3.)   Thus, the potential impact in this respect seems minimal and, even if it delays certain expenditures and rebranding, this short term interruption does not preclude the strategy from ultimately being rolled out should UnityPoint ultimately prevail.   The same cannot be said if Unity Health prevails after UnityPoint has caused confusion and ill-will in its market.

Second, UnityPoint argues that an injunction would damage its reputation in Wisconsin and would be perceived by the public as a sign of inconsistency and instability. The court is not persuaded that this is true, particularly since UnityPoint concedes it has little, if any, reputation in Wisconsin to date, and its affiliation with Meriter has not been

publicized beyond two press events held in October 2013 and in January 2014.  In any event, the court does not believe that UnityPoint's compliance with a court order will lead consumers to believe that either UnityPoint or Meriter is "unstable" or "unable to adapt" to the changing health care industry.

Third, UnityPoint argues that Meriter may be harmed by its inability to market the new affiliation with UnityPoint.  To some extent, the court credits this concern.  Meriter's ability to align itself with a relatively large regional care provider may very well increase consumer confidence in its financial status and the quality of integrated care it can provide, and an injunction would certainly limit its ability to take full advantage of that new affiliation.  Again, however, this potential harm is somewhat mitigated by the fact that Meriter has apparently not yet taken any action to promote the affiliation, nor has it expended any resources on doing so beyond sending a letter to its customers and holding the two, free press events.  At worst, a preliminary injunction would only require Meriter to delay taking affirmative steps to rebrand itself as a UnityPoint affiliate.

Likewise, UnityPoint provides little evidence that the public interest will be better protected by refusing to enter a preliminary injunction.  "In trademark infringement cases, [the Seventh Circuit has] stated that 'the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interest in not being deceived about the products they purchased." *Int'l Kennel Club*, 846 F.2d at 1092 n.8 (quoting *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1986)).  Given that the court has found some likelihood of confusion among consumers -- who may purchase insurance through Unity Health on the mistaken assumption that they will get coverage at UnityPoint hospitals and clinics, or who may avail themselves of

34

UnityPoint health services only to discover later that their Unity Health insurer does not cover those services -- the court finds that the public would be best served by entering some form of preliminary injunction minimizing the likelihood of confusion until trial.

The court has the ability to tailor the terms of such an injunction "so as to minimize and limit the harm to the defendant." *Id.* at 1092. The court has found the likelihood of confusion greatest in the prospective use of the word "Unity" or "unity" standing alone -- for instance, in the use of the tagline "The point of unity is you" -- and in any prospective connection between Physicians Plus and UnityPoint, since Physicians Plus is Unity Health's direct competitor. Accordingly, UnityPoint will be enjoined from employing the word "unity" as a stand-alone word. This injunction should prove minimally harmful, since UnityPoint has not yet planned any advertising and James Woodward testified that, in the short term, the tagline was not as relevant to UnityPoint as the use of the terms "UnityPoint Health Clinic" and "UnityPoint At Home." (*See* Hr'g Tr. (dkt. #92) 24:20-25:6.) UnityPoint will also be enjoined from marketing PPIC's connection with UnityPoint. This, too, should not significantly affect UnityPoint in the short term, as Kevin Vermeer, UnityPoint's Executive Vice President and Chief Strategy Officer, acknowledged. (*See* Hr'g Tr. (dkt. #90) 145:24-146:5.)

Furthermore, UnityPoint will be enjoined from marketing its health care services without the "Meriter" mark as the dominant portion of its mark; this is to say, should it go forward with its proposed rebranding of Meriter at this time, it must use the logos and mark as represented to this court and may not brand its services as offered by "UnityPoint" (or its variations) standing alone. This will minimize the likelihood of confusion by placing the

focus on the "Meriter" mark, and it should not prove harmful to UnityPoint, since it had planned to use this branding in any event.

Nevertheless, the court recognizes that even this limited preliminary injunction could prove harmful to UnityPoint, at least in the short term, as it potentially delays certain benefits it hoped to achieve in acquiring Meriter and PPIC.  If Unity Health is ultimately unsuccessful at trial, UnityPoint will have lost time in establishing itself as a health care provider in this market and in marketing itself as an integrated provider of health care and health insurance alike.  Its ability to market its patient-centered approach, at least through its desired branding, will also be delayed.  (*See* Hr'g Tr. (dkt. #90) 145:12-23.)  While the balance of harms favors entering the a preliminary injunction to maintain the status quo, the court has endeavored to enter a narrowly tailored one and will endeavor to move this matter along quickly so that the preliminary injunction need not be in place for long.  Relatedly, the court's preliminary injunction should be construed reasonably by both sides to allow (1) UnityPoint's innocuous use of the word "unity" in a non-marketing context; (2) UnityPoint, Meriter and PPIC to continue to disclose to patients and customers the new affiliation among them; and (3) UnityPoint to use its standard brochures, pamphlets and related materials in the ordinary course of providing health care services at Meriter and/or Physician Plus locations without having to incur the cost of rebranding in Wisconsin.

At least on the current record, this remains an extremely close case.  Although Unity Health's case on the merits is not overwhelming, UnityPoint's own evidence suggests that certain embodiments of its mark, such as the word "unity" standing alone or the branding of UnityPoint with PPIC, are less important to its brand, leading to the conclusion that preliminarily enjoining those embodiments would cause little immediate harm.  When

weighed against the harm that Unity Health *may* suffer from a misappropriation of its goodwill in this market, the balance of the harms tilts in Unity Health's favor.   In the context of the Meriter-UnityPoint affiliation and mark, however, the court has found both a *smaller* likelihood of confusion (particularly given the degree of consumer care and the relatively weak nature of the claimed "Unity" mark) and a *greater* likelihood of harm to Meriter and UnityPoint upon injunction.   "[T]rademark protection should not interfere with the traditional policies of a competitive market, and courts have generally recognized that the public substantially benefits from competition." *Platinum Home Mortgage Corp.*, 149 F.3d at 726.   Accordingly, even though Meriter has yet to begin active marketing of its affiliation, the court is not persuaded that it is appropriate to enter an injunction wholly preventing UnityPoint from beginning to make a place for itself in this market under its own name in the limited way it currently proposes, understanding, of course, that it does so at its own risk.

Finally, in addition to entry of the preliminary injunction below, the court will hold a telephonic scheduling conference with the parties on Friday, February 7, 2014, at 1:30 p.m. to set an expedited discovery, motion and trial schedule of this matter, as well as to consider the possible designation of a neutral branding expert and address any questions or concerns regarding the language or scope of the court's preliminary injunction.   The parties are encouraged to meet and confer in advance on all of these issues.

ORDER

IT IS ORDERED that:

1. UnityPoint and its affiliates are preliminarily enjoined from:

    (a) using "Unity" or "unity" as a stand-alone word in any of its advertising, marketing materials, logos or marks within the Unity Health Territory as defined above;

    (b) advertising or otherwise marketing any of its health insurance or related services as offered by UnityPoint on a stand-alone basis in the Unity Health Territory as defined above, although it may describe Meriter as an affiliate of UnityPoint Health, UnityPoint Clinic, or UnityPoint At Home provided that Meriter is the dominant mark; and

    (c) advertising, marketing, referring to, or otherwise indicating its affiliation with Physicians Plus Insurance Company in the Unity Health Territory.

2. A telephonic scheduling conference will be held on Friday, February 7, 2014, at 1:30 p.m. with plaintiff's counsel to initiate the call.

Entered this 5th day of February, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge